

# Fourth Court of Appeals
## San Antonio, Texas

### DISSENTING OPINION

No. 04-17-00280-CR

**EX PARTE** Miguel **MARTINEZ**

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2015CR4203
Honorable W.C. Kirkendall, Judge Presiding

Opinion by:    Marialyn Barnard, Justice
Dissenting Opinion by: Rebeca C. Martinez, Justice

Sitting:    Marialyn Barnard, Justice
            Rebeca C. Martinez, Justice
            Irene Rios, Justice

Delivered and Filed:  July 31, 2018

Because I disagree with the majority's misguided analysis and review of the record to determine double jeopardy does not bar a retrial, I dissent.

### FACTUAL AND PROCEDURAL BACKGROUND

A chronological recitation of the relevant events leading up to the mistrial is set forth below.

March 2015 (Pre-Indictment)    Martinez was arrested in January 2015 for the murder of Laura Carter.  In March 2015, Jason Goss, the first-chair prosecutor in the district court to which the case was assigned, gave the prosecution guide to his second-chair prosecutor to review so she could help him prepare the case for presentation to the grand jury.  The next day, the second-chair prosecutor informed Goss that she "had a conflict" with the case because, three years earlier, she had a "one-time sexual encounter" with a man included in the prosecution guide as a State's

witness, Gregory Dalton. Goss instructed the second-chair prosecutor to have nothing further to do with the case, and replaced her with the third-chair prosecutor. Goss also constructed a "firewall" within the District Attorney's office to exclude her from any contact with Martinez's case.

Goss later explained at the habeas hearing that he took that course of action because he believed the second-chair prosecutor had a "conflict," in that her past encounter with Dalton could have affected her objectivity, causing her to be either favorable or unfavorable to Dalton as a witness; Goss also stated her participation in the case could have created an appearance of impropriety. Goss testified he was satisfied the issue was resolved by the firewall, and he told no one else within the District Attorney's office; he also did not speak about it again with the second-chair prosecutor. Goss testified to his belief that, at the time, "what she had told me was not - - was not exculpatory, mitigating or relevant . . . as far as to the facts of this case . . . ." On April 14, 2015, the grand jury returned an indictment against Martinez for the murder of Laura Carter by shooting her with a deadly weapon, namely a firearm. Dalton was not charged.

January 31 and February 1, 2017 (One Week Before Trial)   Martinez's trial was scheduled to begin on February 7, 2017. In preparation for trial, Goss and Nicholas LaHood, the District Attorney, interviewed Dalton on January 31, 2017. Dalton revealed additional, detailed information he admitted withholding from the police; the new information led Goss to conclude that Dalton was a "significant witness." After the interview, Goss prepared an amended *Brady*[1] Notice describing the new evidence and emailed it to the defense attorneys the next day, February 1, 2017. The trial court had previously granted a *Brady* motion filed by the defense.

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

The State's amended *Brady* disclosure stated that Dalton told the prosecutors the following during the interview: one month before the murder, Martinez told him "there was a girl that was going to turn him in" and asked Dalton if he (Martinez) could take her to Dalton's house and kill her there; Dalton thought Martinez was joking; Dalton then asked Martinez, "If you're going to bring her here and kill her, can I f**k her first?"; Martinez replied that "they could take her after he killed her in Dalton's van and dump her body and light it on fire;" Martinez told Dalton he would pay him $1,000 to help him kill the girl; Dalton said he would not do that and still thought Martinez was joking; on the night of the murder, Martinez called Dalton to pick him up from the murder location and Dalton did so; Martinez paid him $400, telling Dalton he was only getting half since Martinez had to do the actual work; Dalton stated he did not know a murder had occurred at the time he picked up Martinez; Martinez later told Dalton that he had killed a girl right before Dalton picked him up; Dalton believed it must be the same girl Martinez was talking about one month earlier.

The amended *Brady* notice did not, however, reveal any information to the defense about the former second-chair prosecutor's previous sexual encounter with Dalton and her initial role in the Martinez case. Defense attorney Christian Henricksen had expressly asked Goss whether he had any other *Brady* information that needed to be disclosed before trial, and Goss replied there was none. Henricksen testified at the habeas hearing that, although Goss delivered a thumb drive with the State's file to the defense about one year before trial, during the week or so before trial the defense attorneys had received almost daily emails from Goss providing various supplemental discovery information. Goss explained at the habeas hearing that he sent the supplemental *Brady* notice to the defense because the new evidence revealed by Dalton during the pre-trial interview "directly stated his willingness to participate with the defendant in the sexual assault and the

murder of the victim on trial" and was clearly *Brady* material which could be used to impeach Dalton's credibility as a State's witness. Goss also stated that the Dalton interview triggered his memory about the sexual encounter the former second-chair prosecutor had with Dalton. Goss reiterated, however, that he personally did not consider the prosecutor-witness relationship to fall under *Brady*, although he conceded he "understood that somebody else might have a different opinion."

Goss informed LaHood about the prosecutor-witness relationship after the Dalton interview and explained the firewall he had created within the District Attorney's office. LaHood's initial reaction was that the information was not required to be disclosed. LaHood called Enrico Valdez, Chief of the District Attorney's Appellate Section, that evening and asked Valdez whether the information needed to be disclosed to the defense. Valdez's initial opinion was that it did not sound like information that needed to be disclosed, but he agreed to research it further. Neither LaHood nor Goss, nor any other member of the District Attorney's office, questioned Dalton or the former second-chair prosecutor about the relationship until after the mistrial.

February 2-3, 2017 (Internal Advice to Goss and LaHood)      In researching whether to disclose the prosecutor-witness relationship to defense counsel, Valdez consulted with Patrick Ballantyne, Chief of the District Attorney's Ethical Disclosure Unit. Valdez then verbally informed LaHood and Goss of their opinion that the information was not required to be disclosed to the defense, but suggested that, "in an abundance of caution," they could disclose it *in camera* to the trial judge.

February 7, 2017 (Pretrial and Voir Dire)      On the morning of trial, the trial court heard pretrial motions. Goss signed the State's Discovery Acknowledgment under article 39.14(i) of the Texas Code of Criminal Procedure, documenting and representing that the State had

disclosed all information relevant to the case.  The document was detailed and lengthy, but made no mention of the prosecutor-witness relationship.  Voir dire proceeded that day and the jury was selected, but not sworn.  The State discussed the law concerning accomplices and parties during its voir dire.  Trial recessed for the day after the jury was selected; the jury was not sworn in until the following day.

February 8, 2017, A.M. (*Ex parte* Conference and Partial Disclosure to Defense)     The next morning, before the jury was sworn, Goss filed a "State's Motion for Ex Parte Communication and In Camera Consideration of Potential Conflict Issue" and gave a copy of the motion to defense attorney Henricksen.  The motion was presented to the trial judge, and she met with Goss in her chambers, with only the court reporter present.  Goss informed the trial judge that the second-chair prosecutor (whom he named) formerly assigned to the 437th district court read the Martinez prosecution guide in January 2015; that she informed him the next day that she had a "one-night stand" with Dalton in 2011, three years before the murder occurred; and that Goss immediately removed the second-chair prosecutor from the Martinez case and created a firewall within the office to separate her from any further involvement in the case.  In explaining Dalton's role in the State's case, Goss proffered that the evidence would show Dalton picked up Martinez from the murder scene; cell phone tower data placed Dalton's phone at the murder scene; a witness saw Dalton's white van leaving the murder scene; and Martinez told Dalton "how" and "what" he did to the victim.  In discussing the second-chair prosecutor's sexual encounter with Dalton, Goss stated, "the one issue that we wanted to bring to the Court's attention that could possibly be raised, is a possible impeachment issue of Dalton."  Goss went on to characterize the impeachment value of the information, from the State's perspective, as "weak."  Goss then asked the trial judge to make the decision "whether or not to disclose to the defense."

After clarifying the chronology of events and inquiring whether there were any agreements between the State and Dalton,[2] the trial judge expressed her opinion that disclosure to the defense was necessary because Dalton was "sort of the star witness" and it was possible the relationship information might come in during the trial as impeachment evidence. The trial judge recalled the voir dire discussion of accomplices and law of parties, stating, "Mr. Dalton could get the finger pointed at him as being some kind of party to this, an accomplice to this, the getaway driver, then he becomes even more of a star witness . . . He's possibly who the defense is going to be pointing the finger at."

At that point, Goss explained the State's theory of the case to the trial court, stating that the State believed Dalton

> picked the defendant up from the murder scene. His phone is at the murder scene. His van is seen at the murder scene. The defendant told him what he did and how he did it. Dalton has information about the murder that no one else could know unless Dalton committed the murder, was present for the murder or was told by the defendant after the murder.

Goss continued,

> the reason we talked about parties is we anticipate that the defense will be that Dalton committed the murder because of these - - because of these things that point to him. And so . . . with those facts, yes, it is not wrong to say that Dalton is a star witness either - - from our perspective we are going to talk about the fact that the things he says is [sic] verified by other things. But from their perspective I can see that they will try to implicate Dalton as one of the parties committing the murder.

Goss again acknowledged the "impeachment value" of the relationship information and agreed that the defendant had the right to review the information, but sought to balance its disclosure against the possible damage to the prosecutor's reputation.

---

[2] Goss told the trial court the State had made no express agreement not to charge Dalton with Carter's murder; however, he stated it was understood from the beginning that, if Dalton's testimony matched the evidence and was credible, he was not going to be charged with the murder.

The trial court explained that in its analysis there were two different issues: (1) whether or not the State should disclose the relationship information to the defense; and (2) whether that disclosure is "usable information, whether it's impeachment or otherwise[,] during the course of the trial." As to the first issue, the judge stated that, "objectively, I think the disclosure may be necessary." As to the second issue, the judge stated she would need to hear Dalton's testimony, "or at least get a better proffer," before she could make a decision on the admissibility of the relationship evidence. The trial judge shared Goss's concern about the information becoming courthouse gossip, and agreed to consider possible remedies to minimize any harmful effects on the second-chair prosecutor's reputation.

At the conclusion of the *ex parte* conference, the trial judge instructed Goss that the relationship information needed to be disclosed to the defense because of how important Dalton was to the State's case. Although the judge informed Goss that it was his decision when to make the disclosure, she advised Goss not to wait any longer because he had the information since 2015 and "there's already a record out there where the defense has suggested stuff is just being turned over at the last minute." The trial judge also stated that she would take a few minutes to look into possible remedies to minimize any harmful effects on the prosecutor's reputation, and indicated that Goss should not yet disclose the prosecutor's name. The court further stated that if that amount of time proved insufficient to find a remedy, the court would "take the responsibility for the delay in disclosure." At the habeas hearing, the trial judge testified that she meant only that she would take responsibility for the delay in revealing the prosecutor's name, not for the delay in disclosing the other details. After the *ex parte* conference concluded, Goss informed LaHood that he had disclosed the prosecutor-witness relationship to the trial judge *in camera*.

Following the *ex parte* conference, Goss disclosed the existence of the prosecutor-witness relationship for the first time to defense attorney Henricksen. Goss stated only that an unnamed prosecutor in the District Attorney's office had a one-time sexual encounter with Dalton three years ago. Goss did not inform Henricksen that the prosecutor at issue was the second-chair prosecutor in the 437th District Court at the time of Martinez's indictment, or that she had reviewed the Martinez case in the pre-indictment phase. Not knowing these undisclosed details, Henricksen testified at the habeas hearing he was "not then overly concerned." Henricksen passed the information along to his co-counsel Joe Gonzales, who testified his focus at the time was on reviewing "voluminous cell tower records" that he had just received during the lunch hour. Trial proceeded, with the jury being sworn and the State giving its opening statement.

During his opening statement to the jury, Goss highlighted Dalton's role as an important witness in the State's case. Goss explained that the police tracked down Dalton because his phone number was called by the same phone that also called Carter on the night of her murder. Goss then detailed Dalton's statement to police, reciting that Dalton told police that he drives a "white van with decals" for work and that matched the description of a van seen by a witness [Luis Castillo] driving down the street right after the gunshots. Dalton also told the police that he picked up a guy, Miguel Martinez, from that street but did not know that Martinez had committed a murder. Dalton admitted calling Martinez's phone that night when he had trouble locating him. Dalton also told police that Martinez paid him $400 or $500 later that evening for picking him up. Finally, Dalton knew certain details about the murder scene that he could only know if he was there or was told about them. Dalton told police that Martinez told him the next day that he had shot the girl on the news. Martinez explained to Dalton that he asked to borrow the girl's cell phone; she handed it to him inside the car; he stepped outside the passenger side of the car; and he

shot her five times in the right side of the head.  Dalton's description of the murder matched details from the scene in that Carter did not have her cell phone even though calls had been made from it that evening, and her wounds showed that she was shot in the head from right to left from the passenger side of the car.  Goss described Dalton to the jury as a witness who "has his issues," but told them that, even though there was evidence suggesting Dalton's involvement in the murder, the jury could still find Martinez guilty as well under the law of parties.

The defense waived its right to make an opening statement, and the State presented the testimony of their first witness, Luis Castillo, before the lunch recess.  Castillo, 17 years old at the time of trial, testified he lived with his grandmother on the street where the murder occurred and he heard the gunshots, saw a Hispanic male wearing a dark hoodie standing outside the car, and saw a white van driving away shortly afterward.

February 8, 2017, P.M. (Full Disclosure)      According to the habeas record, another in-chambers conference was held off the record during an afternoon break between witnesses.  The trial judge testified that she inquired whether Goss had "told them everything?"  When he indicated he had not, the judge ordered him to "tell them everything now."  Goss then disclosed the rest of the details to defense counsel, including the prosecutor's name and assignment to that trial court when the Martinez case came in, her statement that she had a one-time sexual encounter with Dalton three years before, and that she had reviewed the file in the Martinez case during the pre-indictment stage.  At the habeas hearing, Goss stated the trial judge did not couch her order in terms of a *Brady* disclosure, but Goss assumed from the trial court's perspective that it was an order under *Brady*.  Henricksen testified at the habeas hearing that, upon hearing the additional details, he was upset because he felt like the disclosure was now "a completely different thing" which could affect the defense case in many ways, particularly the fact that the prosecutor had

been involved in the Martinez case before indictment. Henricksen stated he had been under the impression that Goss recently learned about the prosecutor-witness relationship, and he was angry that Goss had instead known about the information for two years. Gonzales also testified that he was angry and felt that Goss had been "wrong" to withhold the full information until after the jury was sworn and the evidence had begun. Both defense attorneys stressed that they were placed at a disadvantage by learning the information in the middle of the murder trial.

The attorneys present in chambers, LaHood, Goss, Henricksen, and Gonzales, briefly discussed how to proceed and how to handle the disclosed information. All the attorneys agreed that public disclosure of the prosecutor's name was not preferable or necessary at that stage of trial. LaHood offered to make the District Attorney investigators available to assist the defense attorneys and help them "feel comfortable," and also offered to set up a meeting between the defense attorneys and the second-chair prosecutor and an interview with Dalton. No specific resolution or plan of action was agreed on during the break, and trial resumed.

The State presented two more witnesses, Cynthia Garza, the grandmother of Castillo, and San Antonio Police Officer Mike Wehe. The appellate record does not contain the transcript of their testimony, but the briefs state that Garza testified she also heard the gunshots on her street that night and called 911, and that Officer Wehe described the murder scene he observed as the first responder, stating the victim was found inside her car with a hand in her pocket and her feet crossed, indicating she was not expecting the gunshots and probably knew the shooter; she was shot five times in the head. At the habeas hearing, LaHood testified that, at the end of the first day of testimony, he felt the trial was going "very well" based on the evidence presented so far. Goss also testified that he was happy because everything was going "just as he prepared and planned."

Later that evening, after conferring at length with Gonzales about the disclosed information, defense counsel Henricksen sent a text to the trial judge, LaHood, and Goss expressing "a lot of concerns with what was discussed in chambers today." In his text, Henricksen stated that the defense intended to file a motion for a one-day continuance in the morning so they could "figure out what we need to do to address this issue." LaHood and Goss agreed to the continuance, and the trial judge indicated she would grant the continuance in the morning at a hearing with the court reporter present.

February 9, 2017, A.M. (Motion for Continuance)    In the morning, defense counsel filed a one-page motion for continuance stating, "[a]fter the jury was seated in this case, the state of Texas disclosed to the defense critical and sensitive information that is material to the defensive theory in this case. Due to the late nature of this disclosure, the defendant respectfully requests a continuance of this case in order to investigate this matter." Following a brief hearing on the record, at which the State raised no objections, the trial was continued to the next Tuesday, February 14, 2017.

Following the ruling, an on-the-record discussion was held in chambers between the trial judge, Goss, Henricksen, and Gonzales concerning how the defense's legal and factual investigation into the newly disclosed information would proceed. Defense counsel expressed that the late disclosure during trial had put them in an awkward position, and asserted their duty to investigate the matter in pursuit of their ethical and professional obligations to Martinez, particularly, to investigate the timing and the chronology of events, whether the second-chair prosecutor had any part in the progression of the case and/or any influence over whether to seek an indictment against Dalton as a party to the murder. Defense counsel also opined that the

recently disclosed information "directly impacts on our theory of the case," later adding that "Mr. Dalton at least smells like a codefendant."

After noting that it had already ruled that the information was "discoverable" by the defense, the trial court stated that a second issue was whether the information would be admissible at trial. The trial court explained,

> I think that there's this sort of notion out there from the State that, well, if [the second-chair prosecutor] didn't do anything wrong, there's no way this can come in. And I don't - - I don't agree with that actually . . . they may learn that nothing - - that she had no part in the intake. She had no part in how it was charged, no part in decision-making on who the codefendants were, if any . . . there's still that possibility the defense can use some of this information.

The trial court agreed that the timing of the disclosure after the jury was sworn was "concerning," given that the State had the information for two years prior to trial. The court also recognized that a possible defense theory would be to place blame on Dalton for the murder, or at least consider him as an unindicted co-defendant. The trial court further acknowledged that, from Dalton's perspective, the past sexual encounter with the second-chair prosecutor could give rise to a bias or motive on his part.

Goss replied, "we understand, based upon Brady, based upon Michael Morton that there is the possibility of impeachment . . . It's never been our position that it's not possible to impeach." Goss explained his opinion that "the extrinsic evidence of the impeachment based upon rule 613 is not going to be allowed," but continued by stating, "as far [as] being able to impeach Mr. Dalton about . . . it is a possibility, and we will have an argument for that."[3] Goss explained that it was not until he interviewed Dalton the week before trial, and learned more details about his involvement the night of the murder, that he got "an idea of what the defensive theory might be" with respect to Dalton, and that is when Goss began discussing with his fellow prosecutors whether

---

[3] TEX. R. EVID. 613(b) (impeachment of a witness for bias or interest).

the prosecutor's relationship should be disclosed to the defense. Goss stated, "If I can do it over again, I might have disclosed it earlier because - - because of all this."

The parties discussed scheduling interviews by defense counsel with Dalton and the former second-chair prosecutor, the defense's request for appointment of an independent investigator, and for appointment of appellate counsel to assist in the investigation. At the end of the conference, the trial court appointed an investigator and appellate counsel, Mark Stevens, to assist Martinez.

February 9, 2017, P.M. (Off the Record Meeting in Chambers)        Later that afternoon, Goss texted Henricksen and requested the parties meet in the trial court's chambers. In addition to the trial judge, present for the State were Goss, Valdez, and LaHood, and the defense attorneys present were Henricksen, Gonzales, and Stevens. No court reporter attended because the conference was supposed to involve only scheduling. However, the meeting became heated. Henricksen and Gonzales testified that LaHood entered the meeting already "mad" and "upset." LaHood told them he objected to the "nondisclosure" language used in their written motion for continuance and he was getting inquiries about it from the media. The trial judge also testified that, at the beginning of the meeting, LaHood "expressed that he was not happy about the motion for continuance being handled in open court where the media was present," and LaHood stated he was sorry he sent Goss to handle the motion because he had not realized the hearing would be such a "shit storm." Although he denied that he entered the meeting angry, LaHood confirmed at the habeas hearing that he felt the defense team put on a "shit show" for the media at the continuance hearing that morning, even though the continuance was agreed.

After the topic of the continuance was dropped, the attorneys discussed scheduling a date for trial to resume. LaHood expressed concern about a longer delay because he had other obligations that presented a scheduling conflict. LaHood inquired of Gonzales what the defense

intended to do about the late disclosure of the prosecutor-witness relationship. Henricksen testified LaHood was pushing Gonzales to say the defense would drop the issue and just proceed with the trial. But, Gonzales would not agree to do that because their investigation was not yet complete.

At the habeas hearing, all the witnesses, including the trial judge, testified that LaHood mentioned the granting of a mistrial before anyone else. The trial judge stated that, "Mr. LaHood had indicated that he was willing to get a new jury, to start all over again, the evidence was what it was . . . but that he would be fine with that, with starting over again." LaHood testified at the habeas hearing that he asked Gonzales "Joe, what do you want?" LaHood stated, "we've agreed to a continuance" and "I've offered you every resource from the DA's office." LaHood testified he then said, "[d]o you want a mistrial? Judge, give him a mistrial so we can pick a new jury." At the habeas hearing, LaHood denied that he wanted a mistrial, but confirmed that he was the first person to mention a "mistrial" as a "diagnostic" to find out what Gonzales wanted. LaHood testified that, later in the conversation, he had stated he "would agree to a mistrial" and he "would pick a better jury and be more prepared for trial" next time.

Gonzales responded that, "it was not that simple," and stated that, if the defense investigation revealed any kind of prosecutorial misconduct, they would have to allege it. Gonzales stated he "had a problem" with the way Goss had handled the disclosure and he pointed his finger at Goss. Henricksen and Gonzales later testified that LaHood then "lost it" and went "ballistic." According to Gonzales and Henricksen, LaHood responded to the defense attorneys' comment about possibly raising prosecutorial misconduct by stating, "If you do that, I will shut your practice down." Gonzales testified that LaHood was screaming that he would "destroy" their law practice and "make sure you never get hired on another case in Bexar County." LaHood also stated that he did not care what happened to him because he could always go back to private

practice. Both defense attorneys testified at the habeas hearing that they viewed LaHood's comments as a threat to their livelihood and believed that he had the ability and power as the elected DA to follow through on his threat.

At the habeas hearing, LaHood unequivocally denied threatening to "shut down" Gonzales's law practice. LaHood testified that, instead, he replied to Gonzales's "unethical threat" to allege prosecutorial misconduct and go to the media,[4] by saying, "Do me the f***g favor. Because in the process of defending this office's honor, I will expose you as the unethical lawyer that you are, and let's see what happens to your law practice." LaHood admitted he was "angry" at that point, but insisted he "did not lose control." Goss testified he did not recall hearing LaHood say "those words," with reference to a threat to "shut down your practice."

The trial judge testified at the habeas hearing that after Gonzales stated in a normal, non-threatening tone of voice that he "would possibly have to allege at some point prosecutorial misconduct," LaHood replied that, "he was going to shut down his [Gonzales's] practice." The trial judge testified that Gonzales's tone was not discourteous and his voice was not raised. The trial judge described LaHood's demeanor as "mad" with a raised voice and threatening body language when he made the threat. The judge was concerned about potential physical violence based on the escalating tone and volume of the discussion and ended the meeting.

At the trial judge's suggestion, the prosecutors and defense attorneys walked to a conference room outside of chambers to discuss how to proceed. They had a "civil" yet "tense" meeting in a nearby conference room; prosecutorial misconduct was not mentioned. No firm resolution was reached.

---

[4] LaHood testified that when Gonzalez stated he might file a motion alleging prosecutorial misconduct, he also threatened to "go to the media" with the allegation of misconduct. Goss's testimony matched LaHood's on that issue. However, the trial judge and Henricksen testified that Gonzalez did not make any reference to "going public" or going to the media with a prosecutorial misconduct allegation.

February 10, 2017 (In-Chambers Conference Off the Record)        The next day, an off-the-record conference was held between Goss, Gonzales, and Henricksen in the trial court's chambers. Gonzales stated that LaHood's threat to shut down his law practice had a "chilling effect on him" and on the defense effort. The trial judge stated the words had a "chilling effect" on her as well.

February 13, 2017 (Interviews of 2nd-Chair Prosecutor and Dalton)        As part of their investigation into the late disclosure, defense counsel interviewed the former second-chair prosecutor about her relationship with Dalton in the presence of her supervisor, Valdez. The prosecutor stated that she met Dalton on a dating service and "may have gone out with him once or twice." She could not recall for certain whether they had sex, but stated it may have occurred. She confirmed that she had no other contact with Dalton. She recognized Dalton as a witness in the Martinez case file by his photo and nickname "Vegas." She also confirmed having no contact with the Martinez case file since reporting the matter to Goss in March 2015. The defense attorneys later testified to their impression that she was "holding back" some information based on discrepancies between her statements and the version of a "one-night stand" conveyed by Goss and Dalton.

After refusing to meet with the defense attorneys or their investigator, Dalton was finally interviewed by telephone in April 2017. Dalton confirmed having had a sexual encounter with the prosecutor, but did not recall her name and could only give a basic description that generally matched the prosecutor's appearance. Dalton did not recall what her position was in the District Attorney's office. He also confirmed having no contact with her since the encounter.

February 15-16, 2017 (Plea Bargain & Mistrial Discussions)        Gonzales requested an off-the-record meeting with Jay Norton, Chief of the District Attorney's Conviction Integrity Unit,

to discuss possible solutions in the Martinez case. Henricksen and Gonzales testified their motive in meeting with Norton was to determine whether he could suggest a new, "out of the box" solution to the problem which could avoid the need for a mistrial. Both Gonzales and Henricksen testified they wanted to avoid having to file a motion for mistrial and habeas corpus writ that would lead to a public hearing about the events. At the meeting, Gonzales and Norton discussed various solutions, including a plea bargain; Norton stated he was not authorized to negotiate a plea. Gonzales testified he told Norton that LaHood had suggested a mistrial, but he and Henricksen did not want a mistrial. Norton testified at the habeas hearing that both Gonzales and Henricksen wanted a mistrial, but that LaHood and Goss did not. At the conclusion of the meeting, with no novel solutions found, Gonzales testified he asked Norton if he would talk to LaHood about the State agreeing to a mistrial. Norton discussed the idea with LaHood the next day. According to Norton, LaHood initially refused the idea, but after further discussions LaHood agreed to a mistrial.

February 16, 2017 (Mistrial Granted)   After the parties arrived, defense counsel moved for a mistrial in open court. Present for the State were Goss, Valdez, Ballantyne, and Norton. LaHood was not present, but testified at the habeas hearing that he had consulted with Valdez and Norton. Martinez's attorneys stated on the record that they "did not want" a mistrial and were "reluctantly" moving for one because they felt forced to do so to protect Martinez's right to effective assistance of counsel based on the late disclosure of the potentially impeaching *Brady* information. Defense counsel also informed the court that, depending on the State's next move, they might file a motion to protect Martinez's double jeopardy rights based on prosecutorial misconduct. The State agreed to the mistrial, but refused to agree that it did anything wrong with respect to the late disclosure or that the defense was being forced into a mistrial because of the

State's conduct. Trial was reset to May 15, 2017. Before that date, Martinez filed a pre-trial application for writ of habeas corpus based on double jeopardy seeking to bar a retrial.

April 2017 (Habeas Corpus Hearing & Ruling)      The Honorable W.C. Kirkendall presided over an evidentiary hearing on Martinez's application for habeas corpus. After considering the trial transcript, taking judicial notice of the trial court's file, and hearing the testimony of LaHood, Goss, Gonzales, Henricksen, and the trial court judge, the habeas court denied Martinez's request to bar retrial. The habeas court entered lengthy written findings of fact and conclusions of law in support of its ruling. Martinez now appeals the order denying him habeas corpus relief.

**DISCUSSION**

### Habeas Corpus Standard of Review

"An applicant seeking habeas corpus relief must prove his claim by a preponderance of the evidence." *Ex parte Cruz*, 350 S.W.3d 166, 167 (Tex. App.—San Antonio 2011, orig. proceeding). When reviewing a trial court's ruling on an application for habeas corpus, an appellate court reviews the evidence in the light most favorable to the trial court's ruling, and upholds the ruling absent an abuse of discretion. *Id.*

### Applicable Double Jeopardy Law

Generally, a defendant in a criminal case may not be put in jeopardy by the State twice for the same offense. U.S. CONST. amends. V, XIV; TEX. CONST. art. I, § 14; *see also Pierson v. State*, 426 S.W.3d 763, 769 (Tex. Crim. App. 2014). Because a defendant has a right to have the jury empaneled and sworn in his case to decide it, the protection provided to defendants under the Double Jeopardy Clause attaches after the jury is sworn. *Pierson*, 426 S.W.3d at 769. Absent exceptional circumstances showing the prosecutor intentionally provoked a mistrial, the Double

Jeopardy Clause is not violated if the trial ends prematurely. *Id.* at 770. The United States Supreme Court has explained that when the defendant is the party requesting the mistrial, the Double Jeopardy Clause generally does not bar the State from trying the defendant again. *Oregon v. Kennedy*, 456 U.S. 667, 672, (1982). A retrial may be barred by double jeopardy, however, if the defendant presents objective facts and circumstances to demonstrate that the prosecutor's actions giving rise to the defendant's motion for mistrial were done with the intent "to 'goad' the defendant into moving for a mistrial." *Kennedy*, 456 U.S. at 676.

The standard announced in *Oregon v. Kennedy* for review of double jeopardy claims after a defense-requested mistrial applies to Martinez's claims raised under both the United States and Texas Constitutions. *Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007). Thus, regardless of whether the double jeopardy claim is raised as a federal or state claim, a reviewing court must determine whether a defendant successfully moved for a mistrial because the prosecutor "engaged in conduct that was 'intended to provoke' the defendant into moving for a mistrial." *Id.* at 336 (citing *Kennedy*, 456 U.S. at 679). In *Kennedy*, the Supreme Court stressed that such a degree of prosecutorial misconduct presents a narrow exception to the general rule that retrial is not barred when the mistrial was granted at the defendant's request. *Kennedy*, 456 U.S. at 673. The Supreme Court explained, "[p]rosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Id.* at 675-76. In adopting the *Kennedy* standard, the Texas Court of Criminal Appeals overruled its prior precedent interpreting the Texas constitution's double jeopardy provision to also cover "reckless" conduct by the prosecution. *Ex parte Lewis*, 219 S.W.3d at 337,

371 (overruling *Ex parte Bauder*, 974 S.W.2d 729 (Tex. Crim. App. 1998), and remanding to trial court for consideration under *Kennedy* standard).

In *Ex parte Masonheimer*, decided during the same term as *Ex parte Lewis*, the Texas Court of Criminal Appeals discussed the *Kennedy* standard in the context of nondisclosure of *Brady* material. *See Ex parte Masonheimer*, 220 S.W.3d 494 (Tex. Crim. App. 2007). In that case, the defendant was granted a mistrial in his two previous trials based on the prosecution's failure to disclose *Brady* material. Before the third trial setting, the defendant filed a pre-trial habeas corpus application claiming double jeopardy barred the retrial. The trial court granted habeas relief, finding that jeopardy had attached in the prior trials and retrial was barred by double jeopardy; however, the trial court made no finding as to whether the prosecution intended to provoke a mistrial. *Id.* at 505. On review, the Court of Criminal Appeals looked to cases cited with approval in *Kennedy* in which habeas relief had been granted because the prosecution acted with intent to avoid a probable acquittal. *See id.* at 507-08. Applying that analysis to the facts before it, the Court of Criminal Appeals held that, viewing the evidence in the light most favorable to the trial court's ruling, the record supported a finding that the defendant's two motions for mistrial were "necessitated primarily by the State's 'intentional' failure to disclose exculpatory evidence that was available prior to appellee's first trial with the specific intent to avoid the possibility of an acquittal." *Id.* The court concluded, "[u]nder *Oregon v. Kennedy*, this deliberate conduct, accompanied by this specific mens rea, bars a retrial." *Id.*

Based on the Court of Criminal Appeals's application of the *Kennedy* standard in *Ex parte Lewis* and on *Ex parte Masonheimer*, we have described the double jeopardy analysis as follows, "[a] retrial is not barred by double jeopardy unless the prosecutor engaged in the conduct with the intent to provoke the defense to request a mistrial or the prosecutor intentionally engaged in the

conduct with the intent to avoid an acquittal." *Ex parte Coleman*, 350 S.W.3d 155, 160 (Tex. App.—San Antonio 2011, orig. proceeding) (internal citations omitted).

The habeas applicant has the burden to provide the court with a record sufficient to prove his allegations by a preponderance of the evidence. *Ex parte Coleman*, 350 S.W.3d at 160; *Ex parte Chandler*, 182 S.W.3d 350, 353 n.2 (Tex. Crim. App. 2005). "Appellate review of the [trial] court's ruling is not limited to the evidence adduced at the habeas hearing, but may include the record as it existed before the trial court at the time of the hearing." *Ex parte Coleman*, 350 S.W.3d at 160. The appellate court will reverse the ruling only if the record shows the trial court abused its discretion based on the decision it made when ruling on the defendant's application seeking habeas relief. *Ex parte Wheeler*, 203 S.W.3d 317, 319-20 (Tex. Crim. App. 2006).

### *Findings of Fact*

"When a trial court makes explicit findings of fact, the appellate court determines whether the evidence (viewed in the light most favorable to the trial court's ruling) supports these fact findings." *State v. Yetman*, 516 S.W.3d 33, 36 (Tex. App.—Houston [14th Dist.] 2016, no pet.). The habeas court made the following findings of fact:

> 1. In March 2015, Jason Goss, while working as the chief prosecutor of the 437th District Court for the Bexar County District Attorney's Office, received the prosecution guide and investigator's materials in *State of Texas v. Miguel Martinez*. Mr. Goss provided the prosecution guide to the second chair prosecutor in the court. The parties have agreed not to name this female prosecutor. The Court will refer to her as the Unnamed Female Prosecutor (hereinafter "UFP").
>
> 2. The UFP recognized Gregory Dalton only by his nickname "Vegas" and his picture contained in the prosecution guide. She remembered him as someone she had a one-time sexual encounter with in approximately 2012.
>
> 3. According to Mr. Goss, the UFP had possession of the prosecution guide from late one day until she returned it early the next day, when she told Mr. Goss about her one-time contact with the witness.

4. The evidence is uncontradicted that the UFP was "firewalled", and she had no further involvement with the case. Specifically, the UFP had no part of the investigation, charging decision, or presentation to the grand jury. The UFP also had no interaction with any witnesses, including Gregory Dalton, and did not participate in plea negotiations, in trial strategy, or any other aspect of the case. Another prosecutor was given the second chair assignment until early in 2017 when Mr. LaHood, the elected criminal district attorney, decided to sit as second chair to Mr. Goss.

5. The evidence is uncontradicted that the UFP has had no contact with the witness, Gregory Dalton, since their one-time physical encounter.

6. Mr. Goss testified he believed that the issue was a "conflict" issue and not a *Brady* issue requiring disclosure to the Defendant.

7. Mr. Goss did not disclose the UFP's information to anyone else, even his supervisors, until he advised the criminal district attorney, Mr. LaHood, shortly before trial began.

8. After consultation in the district attorney's office, Mr. Goss made an *ex parte in camera* disclosure to the judge presiding on Wednesday, February 8, 2017, prior to the jury being sworn. Judge Valenzuela ordered Mr. Goss to reveal to the defense that a prosecutor and a witness on the case had a one-time sexual encounter, but did not order him to reveal the identity of the UFP at that time.

9. After meeting with Judge Valenzuela and prior to the jury being sworn, Mr. Goss advised Mr. Henricksen, a defense counsel for applicant, that a prosecutor in the office had a one-time sexual encounter with a witness to the case several years prior to the murder. The defense did not ask the Court for a continuance at this time.

10. After the jury was sworn, opening statements and testimony presented, the Court ordered Mr. Goss to disclose the name of the UFP to the defense. Mr. Goss advised both Mr. Gonzales and Mr. Henricksen of the UFP's name, the witness's name, and the nature of the one-time encounter. Mr. Goss advised the defense that he excluded the UFP from the case, and that she had no contact with the witness since their one-time encounter several years prior. The defense did not ask the Court for a continuance at this time.

11. On February 8, 2017, the trial proceeded.

12. On February 9, 2017, the court granted the defense request for a continuance in order to give them more time to investigate the disclosure made the day before. The State did not object to this request.

13.  The defense attorneys initially had a five-day continuance to investigate and were set to have a twelve-day continuance to investigate.

14.  On February 9, 2017, there was a heated discussion in the court's chambers between Mr. LaHood and Mr. Gonzales.  The credible evidence shows that Mr. LaHood engaged [in] what one witness properly called a "rant."  Mr. LaHood said he would agree to a mistrial, would pick a better jury and be more prepared for trial.  When Mr. Gonzales raised the issue of possible prosecutorial misconduct, Mr. LaHood became enraged and threatened to "shut down" the defense lawyers' practices, to go to the media and do whatever it took.  He said he did not care what happened to him.

15.  On Friday, February 10, 2017, Mr. Goss met with Mr. Gonzales and Mr. Henricksen again, and Mr. Gonzales [sic] discussed resolving the case through a plea bargain.

16.  On February 13, 2017, Mr. Gonzales and Mr. Henricksen, along with a defense investigator, met with the UFP.  They confirmed she had had no contact with Gregory Dalton since 2012.  They also confirmed she did no work on the case and only read the prosecution guide once.

17.  The attorneys who testified, both state and defense, all characterized the UFP as reliable and credible.  None of the recounting of her statements was objected to, and the Court has considered the unobjected-to hearsay as evidence.  The Court finds the UFP is credible.

18.  Mr. Gonzales and Mr. Henricksen spoke with the witness, Gregory Dalton, over the phone, and Mr. Dalton did not remember the UFP's name and was unclear on her position with the district attorney's office.

19.  The witness, Gregory Dalton, denied, through unobjected-to hearsay, that he had any contact with the UFP after 2012.

20.  There is no evidence the witness, Gregory Dalton, used his 2012 encounter with the UFP to curry favor from the district attorney's office or any law enforcement agency.

21.  At the request of Mr. Gonzales, on February 15, 2015 [sic], an assistant district attorney, Jay Norton, went to Mr. Gonzales and Mr. Henricksen's office to discuss the Miguel Martinez case.  Mr. Gonzales mentioned the possibility of a plea bargain, but Mr. Norton said the plea offer Martinez wanted was not on the table.  Mr. Gonzales asked Mr. Norton if he would talk to Mr. LaHood about agreeing to a mistrial.  Mr. Norton agreed to discuss a mistrial with Mr. LaHood.

22.  On February 16, 2017, Mr. LaHood initially refused to agree to a mistrial, but Mr. Norton was able to convince him to have the State agree to a mistrial.

23. The defense filed a motion for mistrial, and the State did not object. The defense motion for mistrial was granted by Judge Valenzuela.

24. Mr. Goss testified that he did not want to agree to a mistrial.

25. The State's attorneys testified they believed the State had a strong case. Mr. Gonzales referred to it as "a strong circumstantial case".

26. The State's attorneys and the defense attorneys all testified they approved of the jury.

27. The defense did not present any rational basis that the information about the UFP and the witness Dalton would be material, relevant or admissible in evidence before a jury.

While these findings of fact are generally supported by the record, the findings omit, or disregard, certain relevant facts from the record. Specifically, Finding of Fact #6 correctly states that in March 2015 Goss believed the prosecutor-witness relationship was a "conflict" issue and not a *Brady* issue, but completely disregards Goss's multiple statements on the record later acknowledging the potential impeachment value of the information to the defense after Goss realized Dalton was a "significant witness" for the State and a person the defense would seek to blame as an accomplice or unindicted co-defendant. At one point, Goss stated that the State had "never denied the impeachment value" of the information and agreed that the defendant had a right to review the information. The record shows the trial judge also recognized the importance of Dalton as the State's "star witness," both from the State and defense perspectives, had opined to Goss that disclosure to the defense was necessary, and had stated the relationship information might be admissible at trial.

Further, Finding of Fact #8 misstates that the trial court "ordered Mr. Goss to reveal to the defense that *a prosecutor* and *a witness* on the case had a one-time sexual encounter" but did not order Goss to reveal the "identity" of the UFP at the end of the *ex parte* meeting before the jury was sworn. The record shows Goss was advised a week before trial to disclose the information to

the trial court *in camera*. On the second day of trial, after pretrial motions and voir dire, Goss filed a motion for ex parte communication with the trial judge asking whether to disclose the relationship information to the defense, seeking to balance its disclosure against possible damage to the UFP's reputation. The trial court instructed Goss to make the relationship disclosure to the defense and to withhold only the name of the UFP, and stated she herself would take "a few minutes" to consider possible remedies to minimize harm to the UFP's reputation. The trial court left for Goss the decision when to make the disclosure. The record does not support a finding that the trial court ordered Goss to withhold disclosure of anything more than simply the name of the UFP, including her assignment as the second chair prosecutor at the time the Martinez prosecution guide came into the court at the pre-indictment stage.

In addition, Finding of Fact #10 correctly states that, after the jury was sworn, the trial court ordered Goss to disclose to the defense the name of the prosecutor who had the relationship with Dalton. But, the finding omits the fact that the trial court, having determined during a break between witness testimony that Goss had failed to make full disclosure as advised, ordered Goss to disclose "everything." Goss only then disclosed the additional details revealing the prosecutor's involvement in the Martinez case — that the prosecutor was assigned to the trial court at the time the Martinez case came in and that she reviewed the prosecution guide during the pre-indictment stage. In other words, Finding of Fact #10 does not make clear that the defense did not receive a full disclosure of the relevant details showing the prosecutor's connection to the case until after the jury was sworn.

Finding of Fact #23 correctly states that the defense filed a motion for mistrial, but states that the State "did not object," rather than that the State "agreed to the mistrial." The record is undisputed that the State ultimately did "agree" to the trial court granting a mistrial. What the

State did not agree to was that the mistrial was the result of prosecutorial misconduct, or that the mistrial was forced or provoked by its conduct. The finding also omits the fact, apparent from the record, that at the time the defense moved for a mistrial, counsel stated that Martinez "did not want a mistrial" but felt "forced" into moving for a mistrial by the State's conduct.

Finally, the court's findings that Martinez's counsel did not attempt to investigate the information or seek to avail themselves of a continuance are directly rebutted by the record.

### *Conclusions of Law*

Based on its fact findings, the habeas court made the following Conclusions of Law:

28. For a *Brady* violation to occur, the evidence withheld must be: a. undisclosed, b. favorable to the accused, and c. material.

29. Further, in order to cross-examine a witness regarding potential motive to lie or bias in their testimony, the defense is required to show a good faith basis for the questioning, particularly, for testimony as salacious and remote as contemplated here. Mere speculation regarding the testimony is insufficient to establish its materiality.

30. For retrial to be barred by jeopardy after a defense motion for mistrial, the evidence must show that the State committed misconduct with the intention of provoking a mistrial motion by the defendant or that State committed grave misconduct to avoid an acquittal. Barring retrial is an extreme remedy and difficult to obtain.

31. In this case, the evidence was not undisclosed because it was revealed to defense counsel before the jury was sworn albeit without the name of the UFP. Because the UFP had no involvement in the case (other than reading a portion of the prosecutor's guide), the name would not have added material information at that time. The defense requested no continuance and did not investigate further at that time.

32. There was no evidence of any connection between the 2012 encounter of the UFP and the witness and the involvement of the witness in the 2015 murder investigation. Therefore the information from the UFP was not favorable to the accused.

33. Since there was no *Brady* material in the information from the UFP, the State was under no obligation to disclose it.

34. The evidence from the UFP is not material. The defense did not provide any good faith basis, nor can the Court conceive of one, where the information from the UFP could be used as either direct evidence or impeachment.

35. Further the defense counsel did not avail themselves of the remedy of a continuance to determine if they could have put the information they learned to use at trial.

36. The State did not intentionally provoke or goad the defense into requesting a mistrial.

37. The defense requested the mistrial in the meeting with Jay Norton, and both Mr. LaHood and Mr. Goss testified they were initially reluctant to agree to it.

38. Mr. LaHood engaged in the unprofessional and uncalled-for "rant" referenced above, which may be subject to sanctions in another tribunal, but neither the intent nor the effect of his behavior was to force the defense to move for mistrial. The behavior, if done with any intent, was done to attempt to deter the claim by the defense of jeopardy [ attaching … sic] by reason of prosecutorial misconduct, an issue separate from the mistrial. The State did not object to the mistrial.

39. Retrial is not jeopardy barred for the reasons stated.

*Analysis*

The habeas court's conclusions of law focus on whether or not the information qualified as undisclosed *Brady* material, i.e., "favorable to the accused" and "material." Conclusions of Law #28-29, 31-34 analyze the *Brady* issue and conclude the information was "not undisclosed," "not favorable," and "not material," and therefore the State had "no obligation to disclose it." In Fact Finding #27, the court also finds that Martinez failed to present "any rational basis that the information about the UFP and the witness Dalton would be material, relevant or admissible in evidence before a jury." While the court states the correct double jeopardy test in Conclusion of Law #30, and recites in Conclusion of Law #36 that the State "did not intentionally provoke or goad the defense into requesting a mistrial," its ultimate conclusion that retrial is not barred by double jeopardy stems from its Conclusion of Law #33 that "there was no *Brady* material." Based

on that conclusion, the court states the prosecutors were "under no obligation to disclose" the information; therefore, there was no prosecutorial misconduct.

The habeas court's focus, as is the focus of the authoring justice, on the character of the withheld information is misplaced in the context of the habeas petition where the pertinent issue is whether the State acted with the requisite intent to goad or provoke the mistrial request by the defense. As this Court noted in *Ex parte Coleman*, in addressing the habeas petition the court must distinguish between (i) the prosecutor's intentional act or omission (in this case the decision not to fully disclose the relevant information before the jury was selected and sworn) which led to the remedy of a mistrial, and (ii) whether the prosecutor's act or omission was accompanied by the specific intent necessary to bar a retrial, i.e., intent to goad or provoke a mistrial to subvert the defendant's double jeopardy protections or to avoid a possible acquittal. *See Ex parte Coleman*, 350 S.W.3d at 160-61. The trial court's granting of the mistrial in Martinez's case cured the due process violation stemming from the State's failure to timely disclose the information. *See id.* at 160 (the impropriety of the prosecutor's action was "remedied by the mistrial"). In addressing the habeas petition and determining whether retrial is barred, the court does not retry the issue that led to the mistrial. *Id.*

Instead, the relevant issue at this stage is whether Martinez met his burden to prove by a preponderance of the evidence that the State's conduct was done with the specific intent to goad or provoke Martinez into moving for a mistrial in order to subvert his double jeopardy rights and retry him, or to avoid the possibility of an acquittal. *Id.* The habeas court found to the contrary, and we must determine whether it abused its discretion in reaching that conclusion based on the habeas evidence and the trial record, viewed in favor of the court's findings. *Id.* In making this determination, we consider the following list of non-exclusive objective factors provided by the

court in *Ex parte Wheeler* to assist trial courts and reviewing courts in assessing whether the

prosecutor had the required state of mind:

> 1) Was the misconduct a reaction to abort a trial that was "going badly for the State?" In other words, at the time that the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal?
>
> 2) Was the misconduct repeated despite admonitions from the trial court?
>
> 3) Did the prosecutor provide a reasonable, "good faith" explanation for the conduct?
>
> 4) Was the conduct "clearly erroneous"?
>
> 5) Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety?
>
> 6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they consistent with intentional . . . misconduct?
>
> *Ex parte Wheeler*, 203 S.W.3d at 323-24 (modified to delete "reckless misconduct" from

the sixth factor per *Ex parte Lewis*).

We initially consider whether the prosecutors' actions leading up to the mistrial were a

reaction to avoid a possible acquittal under the first *Wheeler* factor. *Id.* The record shows that

LaHood was the first person to suggest a mistrial as the remedy for the problematic late disclosure,

stating, "Judge, give him a mistrial so we can pick a new jury," and representing that the State

"would agree to a mistrial" and would "pick a better jury and be more prepared for trial" next time.

Those statements by the District Attorney, on their face, indicate an intent to avoid the possibility

of an acquittal (based on lack of preparation or a "bad" jury") through an offer to agree to a defense-

requested mistrial based on the late disclosure. Although these statements weigh in favor of

finding that LaHood believed the trial could be going better, both Goss and LaHood also testified

they were happy with the jury and felt the State's case against Martinez was strong as stated in the

trial court's Findings of Fact #25 and #26. Therefore, I cannot conclude the record establishes that the prosecutors had the required state of mind under the first *Wheeler* factor. *See id.*

Turning to the second *Wheeler* factor, although advised a week before trial by the Chief of the Ethical Disclosure Unit to disclose the relationship information to the trial court, Goss revealed the full information to the trial judge *ex parte* at the beginning of the second day of trial, before the jury was sworn and thus before jeopardy attached. Even though the trial court instructed him the information needed to be disclosed to the defense and "not to wait any longer," Goss made a conscious decision to make only a vague, partial disclosure to the defense which omitted the critical details that the court's second-chair prosecutor reviewed the Martinez case file before indictment. Not until after the jury was sworn and the State's first witness had finished testifying, did Goss finally make a full disclosure to the defense attorneys, and that full disclosure occurred only after the trial court ordered disclosure for a second time. Despite Dalton's significance in the case, the State through its prosecutors repeatedly made deliberate decisions not to fully disclose the information to the defense up to and leading into the trial. Thus, I would conclude the second *Wheeler* factor concerning repeated misconduct despite admonitions from the trial court is satisfied. *Id.*

With respect to Goss's proffered explanation for not disclosing the information sooner and the plausibility of the basis for his conduct (*Wheeler* factors three and five), Goss stated his main concern was to protect his fellow prosecutor's reputation. While that motivation is a plausible basis for the nondisclosure during the two years before trial, Goss stated he realized Dalton's significant role in the case for both the State and the defense, and recalled the prosecutor's relationship with Dalton, during the week before trial. At that time, the desire to protect a colleague's reputation, while understandable, was no longer a reasonable explanation for failing

to comply with the State's continuing duty of disclosure under *Brady* and article 39.14, not to mention the trial court's specific instructions. Importantly, Goss was told by the trial court *in camera* before the jury was sworn that she would take responsibility for the delay in disclosing the name of the prosecutor and advised Goss to make full disclosure to the defense, omitting only the actual name of the prosecutor. Any concern for his fellow prosecutor's reputation was immediately remedied.[5] The trial court specified that the decision when to make the disclosure was up to Goss and advised him "not to wait any longer." Goss deliberately withheld the details that made the UFP's relationship to the state's star witness significant to the defense until after Goss had begun his case-in-chief, and he made full disclosure only after the trial court ordered him to do so a second time. Therefore, under the third and fifth *Wheeler* factors, Goss failed to provide a reasonable, "good faith" explanation for the conduct and his conduct lacked a legally or factually plausible basis. *Id.*

Regarding the fourth *Wheeler* factor, I note the record unequivocally shows the trial court considered the prior sexual relationship and the second-chair prosecutor's initial role in the Martinez case to be the type of information that falls within *Brady* and Code of Criminal Procedure art. 39.14(h), and ruled that the State had a duty to disclose it to the defense. The Michael Morton Act, which was effective on January 1, 2014 and applies to this case, does not contain a requirement that the information be material or admissible at trial in order for the State to have a duty to disclose. TEX. CODE CRIM. PROC. ANN. art. 39.14(h) (West 2018); *Schultz v. Commission for Lawyer Discipline of the State Bar of Texas*, No. 55649, 2015 WL 9855916, at *10-11 (State

---

[5] It is indecorous for the majority to suggest that the required disclosure of facts to Martinez's defense counsel would inevitably result in the dissemination of those facts as gossip "like wildfire through the courthouse." Nothing in the record invites the majority author's groundless implication against the integrity of defense counsel. Most disturbing is the author's invitation to a prosecutor to withhold information from proper disclosure when he subjectively determines a "plausible" basis to do so.

Board of Disciplinary Appeals 2015) (discussing the State's duty of disclosure under Tex. Disciplinary Rules Prof'l Conduct R. 3.09(d) which was codified in article 39.14). The trial court recognized the significance of Dalton as a witness in the case — characterizing him as the "star witness" for the State, and an "unindicted co-defendant" whom the defense would seek to blame for the murder. The record shows the trial court cautioned Goss during their *ex parte* conference about complaints from the defense against repeated disclosures made "at the last minute." The trial court repeatedly characterized the undisclosed information as having impeachment value to the defense, a fact which Goss also acknowledged, as well as the potential to be admissible at trial. I would conclude that the information was required to be disclosed by the State at the earliest opportunity, whether under *Brady* or Code of Criminal Procedure article 34.19(h), and whether expressly ordered by the trial court or pursuant to the State's continuing duty of disclosure.[6] Therefore, the State's failure to timely and fully disclose the information to the defense was a due process violation which was "clearly erroneous" under the fourth *Wheeler* factor. *See Wheeler*, 203 S.W.3d at 323-24.

With regard to the sixth *Wheeler* factor, the evidence is undisputed that Goss and several other prosecutors in the District Attorney's office made a series of deliberate decisions not to make a full disclosure of the information until after the jury was sworn and after the trial court ordered it. Goss acknowledged that the significance of Dalton to the defense became apparent to him after the pre-trial interview with Dalton; however, Goss made a conscious decision not to disclose that information to the defense at that time – the week before trial – and withheld it from his amended *Brady* disclosures. In addition, Goss signed a pretrial discovery acknowledgement representing

---

[6] In characterizing Goss's obligation to disclose as arising only upon the trial court's (second) order to disclose "everything," including the UFP's name, the majority ignores the effect of the pretrial *Brady* order and the State's continuing duty of disclosure under *Brady* and article 39.14(h).

that all information had been disclosed to the defense and verbally assured Henricksen that the State had no additional information that needed to be disclosed. During the week prior to trial, several discussions occurred among the members of the State's prosecution team about whether to disclose the relationship evidence; a recommendation was made to seek instruction from the trial court *in camera* which was made at the last minute and then ignored; and conscious decisions were repeatedly made not to disclose it to the defense prior to trial. Based on the foregoing, I would hold that the sixth *Wheeler* factor concerning intentional actions, rather than inadvertence, lack of judgment, or negligence, is met. *Id.*

Finally, LaHood's threats to "shut down" the defense lawyers' practices if they alleged prosecutorial misconduct must be considered. In its Conclusion of Law #38, the habeas court discounted the importance of LaHood's threats to defense counsel, stating that, "neither the intent nor the effect" of LaHood's threats was to force the defense to move for a mistrial; instead, "if done with any intent," the threats were an "attempt to deter the claim by the defense of jeopardy attaching by reason of prosecutorial misconduct." The court concluded that was "an issue separate from the mistrial." I disagree. The threats were intertwined with the suggestion of a mistrial by the State. The defense attorneys testified they considered LaHood's comments a "serious threat" to both their ability to effectively represent their client Martinez and their personal ability to practice law in Bexar County, and they believed that, as the elected District Attorney, LaHood had the power and ability to follow through on the threats. The defense attorneys, as well as the trial judge, characterized the effect of LaHood's threats as having a "chilling effect" on them and their representation of Martinez. Viewed objectively, the District Attorney's threats to "shut down" the law practice of the attorneys representing Martinez if they alleged prosecutorial misconduct based

on the late disclosure showed an intent to force the defense to accept a mistrial and subsequent retrial in lieu of pursuing a legal remedy which could bar retrial.

Weighing the objective, but non-exclusive, *Wheeler* factors along with the unique occurrence of the District Attorney's threats to defense counsel, I would conclude that the preponderance of the evidence establishes the State acted with the intent to goad or force the defense into moving for a mistrial to subvert Martinez's double jeopardy protections. *See Ex parte Coleman*, 350 S.W.3d at 160; *see also Ex parte Masonheimer*, 220 S.W.3d at 506.

### CONCLUSION

Based on the foregoing reasons, I would hold that the habeas court abused its discretion in denying Martinez's petition for habeas corpus relief. Because the majority concludes otherwise, I must dissent. I would reverse the habeas court's order, grant Martinez's petition for habeas corpus relief, and render judgment that retrial is barred.

Rebeca C. Martinez, Justice

PUBLISH