

# NUMBER 13-23-00030-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## EX PARTE RC CURTIS

**On appeal from the 187th District Court
of Bexar County, Texas.**

## MEMORANDUM OPINION

**Before Justices Tijerina, Silva, and Peña
Memorandum Opinion by Justice Tijerina**

Appellant RC Curtis was charged with capital murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.03. By four issues, which we combine into one, appellant argues the trial court's denial of his pretrial motion for writ of habeas corpus violates the double jeopardy clauses of the United States Constitution and the Texas Constitution because the State provoked a mistrial and intentionally failed to disclose exculpatory evidence to avoid the possibility of an acquittal. We affirm.

## I.    BACKGROUND[1]

Appellant was indicted with capital murder that allegedly occurred on October 21, 2015. *See id.* § 19.03. The indictment alleged that appellant strangled Paula Boyd, the grandmother of appellant's wife, and struck her with a deadly weapon in the course of committing aggravated sexual assault. A jury trial commenced on November 1, 2021.

During the State's case-in-chief, San Antonio Police Department (SAPD) Detective Randal Hines revealed for the first time that SAPD performed what he identified as a "phone dump" on Antonio Jones's cell phone.[2] Apparently, Jones had knowledge of an alleged video of Boyd's murder. Neither the State nor appellant were aware a phone dump was performed on Jones's phone. After learning of this undisclosed evidence, the trial court instructed the State to investigate the matter "by tomorrow morning."

The following morning, in accordance with the trial court's instructions, the State notified the trial court and appellant that it turned over the phone dump records to appellant. Appellant requested a continuance to review the contents of the phone dump. The trial court granted the motion for continuance and directed the State to "make sure [appellant] has everything. Period."

On Sunday November 7, 2021, while the trial court was in recess, the State informed the court and appellant that it learned it was in possession of "two video statements that had not been provided to the Defense." The first video statement was an

---

[1] This case is before this Court on transfer from the Fourth Court of Appeals in San Antonio pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

[2] Detective Hines did not elaborate on what a "phone dump" entails.

interview of Jones, and the second video statement was an interview of Antonio Pena. Apparently, Pena also had knowledge of an alleged video of Boyd's murder. Appellant moved for a mistrial and a dismissal with prejudice. The trial court granted the motion for a mistrial, but it denied the dismissal with prejudice.

On July 1, 2022, appellant filed an application for writ of habeas corpus, alleging that a retrial was barred by Double Jeopardy. The habeas court held a hearing on appellant's application on September 21, 2022. On December 6, 2022, the habeas court denied the application, entering written findings of fact and conclusions of law in support of its decision:

> Based on the [habeas] court's review of the entire record, after considering the parties' arguments and briefing, and after analyzing the case law cited by the parties and discussed herein as it applies to the facts of this case, this court finds that the defendant has failed to prove by a preponderance of the evidence that the prosecution team engaged in misconduct with the intent to goad or provoke the defense into moving for a mistrial after jeopardy attached or to avoid a possible acquittal.

This interlocutory appealed followed.

## II.  STANDARD OF REVIEW & APPLICABLE LAW

We review a habeas court's ruling on a pretrial application for writ of habeas corpus for an abuse of discretion, reviewing the facts in the light most favorable to the habeas court's ruling. *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App. 2006). We will uphold the habeas court's ruling absent an abuse of discretion. *See id.* (stressing the importance of deferring to the trial court's assessment of the facts, including the State's state of mind). "An abuse of discretion does not occur unless the [habeas] court acts 'arbitrarily or unreasonably' or 'without reference to any guiding rules and principles,'"

3

*State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)), or unless the habeas court's decision "falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). "[W]e must afford great deference to the habeas court's findings and conclusions, especially when, as here, they involve determinations of credibility and demeanor." *Ex parte Martinez*, 560 S.W.3d 681, 695 (Tex. App.—San Antonio 2018, pet. ref'd).

Appellant has the burden to prove his allegations by a preponderance of the evidence. *See Ex parte Coleman*, 350 S.W.3d 155, 160 (Tex. App.—San Antonio 2011, no pet.). Appellant "must also provide the court with a sufficient record to prove his allegations." *Ex parte Martinez*, 560 S.W.3d at 695. We review the habeas court's ruling by reviewing "the evidence adduced at the habeas hearing and the record as it existed before the habeas court at the time of the hearing." *Id.*

The federal and Texas constitutions' double jeopardy provisions protect a defendant from repeated attempts at prosecution for the same criminal offense. *Wheeler*, 203 S.W.3d at 322; *see Green v. United States*, 355 U.S. 184, 187–55 (1957) (providing that double jeopardy precludes the State with all its resources and power from making repeated attempts to convict an individual "thereby subjecting him to embarrassment, expense[,] and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty"). The Texas Court of Criminal Appeals has adopted the federal standard for double jeopardy claims when interpretating state constitutional law. *See Ex parte Masonheimer*,

4

220 S.W.3d 494, 505–06 (Tex. Crim. App. 2007) (adopting the standard set out in *Oregon v. Kennedy*, 456 U.S. 667 (1982)). "Thus, any analysis under the Texas Constitution would be the same" analysis as that under the federal constitution. *Ex parte Martinez*, 560 S.W.3d at 702.

A retrial is prohibited under the federal double jeopardy clause only when the prosecutorial "conduct giving rise to the successful motion for a mistrial was intended to provoke [or goad] the defendant into moving for a mistrial." *Kennedy*, 456 U.S. at 679. The State's actions must amount to intentional misconduct; that is, mere negligence will not suffice. *See Ex parte Masonheimer*, 220 S.W.3d at 507. Thus, when a defendant moves for a mistrial and subsequently claims retrial is barred by double jeopardy, the habeas court "must determine whether: (1) the prosecutor engaged in conduct to goad or provoke the defense into requesting a mistrial; or (2) the prosecutor deliberately engaged in the conduct at issue with the intent to avoid an acquittal." *Ex parte Martinez*, 560 S.W.3d at 698. In this case, as well as in *Ex parte Martinez*:

> the issue is whether, viewing the evidence in the light most favorable to the habeas court's ruling, the habeas court abused its discretion in concluding [appellant] failed to prove by a preponderance of the evidence that the prosecutors engaged in conduct—withholding of potential . . . evidence under *Brady* or Article 39.14(h)—with the intent to goad or provoke [appellant] into moving for a mistrial after jeopardy attached or to avoid a possible acquittal.

*Id.* at 697.

To assess the State's state of mind, we review the following non-exclusive objective factors:

5

1)      Was the misconduct a reaction to abort a trial that was "going badly for the State?" In other words, at the time that the prosecutor acted, did it reasonably appear that the defendant would likely obtain an acquittal?

2)      Was the misconduct repeated despite admonitions from the trial court?

3)      Did the prosecutor provide a reasonable, "good faith" explanation for the conduct?

4)      Was the conduct "clearly erroneous"?

5)      Was there a legally or factually plausible basis for the conduct, despite its ultimate impropriety?

6)      Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, lack of judgment, or negligence, or were they consistent with intentional . . . misconduct?

*Ex parte Wheeler*, 203 S.W.3d at 324.

### III.      DISCUSSION

Appellant argues retrial is barred by the double jeopardy clauses of United States and Texas constitutions because the State provoked a mistrial and the State intentionally failed to disclose exculpatory evidence to avoid the possibility of an acquittal. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

### A.      Pertinent Facts

At the habeas hearing, Detective Hines testified that he turned over the prosecution guide to the District Attorney's (DA's) office in March 2016.[3] A few months

---

[3] "The prosecution guide is prepared in its entirety by law enforcement; no part of the guide is prepared by the [DA]'s Office. The guide generally includes initial offense reports, witness statements, discs of interviews, etc. It is used by prosecutors 'to figure out the nuts and bolts of the case.'" *Ex parte Martinez*, 560 S.W.3d 681, 683 (Tex. App.—San Antonio 2018, pet. ref'd).

6

later, Detective Hines interviewed Jones and Pena. According to Detective Hines, he submitted the video statements to the DA's office, but he could not recall the date, and he did not get a receipt for the submission. The video statements were in the form of DVDs inside an envelope dated August 2016. Detective Hines testified that the substance of the video statements indicated that there may have been other witnesses to the murder, and there may have been a recording of it. Although Detective Hines filed two supplements to the original prosecution guide, he did not remember why he did not include the interviews with Jones or Pena in the supplements. Irrespective of the video statements, Detective Hines explained that he obtained an arrest warrant for appellant based on appellant's "DNA located on [Boyd's] body . . . [i]n her mouth; and . . . under her fingernails."

The original prosecutor testified that her involvement in the case in 2016 was very brief, she did not read the file, and she "never physically handed off a file" to the next prosecutor. She stated that the evidence handwritten in the logbook from 2016 reflected that prosecution guides were dropped off by detectives, yet the video statements "were dropped off by themselves without being paired with the prosecution guide," and "were not logged in, in any manner, back in August of 2016." Thus, there was no record that the State received the video statements in connection with this case. The original prosecutor clarified that she did not "know where those DVDs were," she did not "ever hide those DVDs," and she did not "know anything" about them.

Next, the first-chair prosecutor testified that he acquired this case in the summer of 2017. According to the first-chair prosecutor, during the trial court's recess, Detective

7

Hines informed him about his previous interview of Jones. After conferring with Public Safety Headquarters, the State then became aware it was in possession of two interviews in the form of DVDs. The first-chair prosecutor testified that throughout the State's preparation for trial, the State conducted numerous pretrial hearings with Detective Hines; however, Jones's role in the murder was never discussed, and the State did not know that Pena existed. When the trial court asked how it was possible that the State was unaware of the existence of the two interviews, the first-chair prosecutor answered: "It's a difficult question to sit here and answer, [but] I presumed that my predecessors had all applied the system correctly." The first-chair prosecutor explained that the State was not "aware of either of [the two video statements] until being in Detective Hines'[s] office November 5th of 2021."

The second-chair prosecutor similarly testified that he was unaware of the video statements pertaining to Jones and Pena; otherwise, he would have uploaded them into the digital evidence manager. The second-chair prosecutor affirmed that he did not "conceal any videos or evidence with intent to avoid an acquittal or to provoke a mistrial." The second-chair prosecutor stated that he did not have a discussion with Detective Hines about Jones or Pena.

The habeas court found all witnesses to be truthful and credible and found that the State's misconduct in failing to timely disclose the evidence in question was not committed with the specific intent to provoke a mistrial, subvert double jeopardy, or avoid an acquittal.

8

**B.     Analysis**

To determine whether the habeas court abused its discretion in denying appellant's application, we consider the evidence in the light most favorable to the habeas court's denial using the *Wheeler* factors. *Ex parte Martinez*, 560 S.W.3d at 697. We note that appellant does not cite to any of the *Wheeler* factors and does not cite to any case law applying the *Wheeler* factors to the facts of this case. *See Ex parte Wheeler,* 203 S.W.3d at 323–24; *see also* TEX. R. APP. P. 38.1(i). Nonetheless, we address each factor below.

**1.     Did it Reasonably Appear at the Time of the State's Actions or Inactions Prior to the Mistrial that Appellant would likely Obtain an Acquittal?**

In its opening statement, the State informed the jury that appellant was married to Boyd's granddaughter. The State expected the evidence to show that Boyd, a seventy-five-year-old woman, suffered from debilitating arthritis, walked with a cane, was assaulted, suffered extreme injuries, and ultimately died. The State informed the jury that Boyd's daughter would testify that she shared a checking account with Boyd, and she would check Boyd's account daily. On the night Boyd was murdered, Boyd's credit card was used at an ATM, which was concerning because Boyd did not drive. The State explained that it would provide video evidence of appellant using Boyd's credit card at an ATM on the night she was murdered. The State told jurors it expected a detective to testify that Boyd's credit cards were used several days after her murder by a group of people. The State explained that appellant provided DNA evidence, and forensic scientists would show that "the sum total of that evidence" and the "evidence found . . . in the autopsy from

9

[] Boyd's body cannot exclude [appellant]." Thus, the State explained that the evidence would connect the DNA evidence found on Boyd to appellant.

SAPD Officer Raul Tapia testified that when he arrived at Boyd's apartment, the door was unlocked, and there was no sign of forced entry. Boyd was found in her bedroom floor, completely naked, and the sheets were pulled off the bed. Two walking canes were found underneath her body. Photos of the crime scene were published to the jury.

SAPD officer Eric Roberson testified that when he arrived at the crime scene, he observed Boyd "on the bedroom floor with blood on her face and nose and mouth." Officer Roberson executed a search warrant at appellant's apartment, and he recovered a clear plastic walking cane from a hallway closet, a ball cap, a red muscle shirt, and a pair of grey and red Nike tennis shoes size 11.5.

The medical examiner testified that Boyd had extensive injuries to her face and neck area. Particularly, there was hemorrhage to her eyeballs, eyelids, a contusion at the hairline, a fracture and contusion to her nasal bridge, multiple lacerations and contusions of the face, lips, and eyebrows, bruising on and around the left eye, abrasions of the skin, lacerations of the skin, swelling of the cheeks, bruising of the ears, her tongue was clenched between her teeth, her spine and neck were fractured, and fifteen of her ribs were fractured. The medical examiner opined that Boyd was strangled and was "confident" that a "blunt object struck [a] portion of her head." Additionally, the medical examiner collected DNA from Boyd's vaginal, rectal, and oral cavities as well as fingernail clippings.

Detective Hines testified that he received information that Boyd's credit cards were used several times at an ATM, McDonald's, and different Wal-Marts after her death. The ATM's video surveillance was published to the jury, and it revealed a black man, about 6'4," and over 300 pounds, wearing blue shorts, red muscle shirt, and a ball cap retrieving cash from Boyd's account on the same day her body was discovered. Boyd's family identified the man in the video as appellant.

SAPD Detective Richard Richardson interviewed appellant. Appellant informed Detective Richardson that he stopped at the ATM to check to see if he obtained "money on his debit card for unemployment." During the interview, appellant voluntarily provided Detective Richardson with a sample of his DNA.

Viewing the evidence in light most favorable to the habeas court's ruling, we hold that the habeas court could have determined that it did not reasonably appear "in the time leading up to the mistrial that [appellant] was likely to obtain an acquittal." *Ex parte Martinez*, 560 S.W.3d at 699; *see also Martinez v. State*, No. 13-19-00312-CR, 2020 WL 5757196, at *4 (Tex. App.—Corpus Christi—Edinburg Aug. 6, 2020, pet. ref'd) (mem. op., not designated for publication) (analyzing this factor and finding that "[n]othing in the record suggests that the failure to produce the [discovery] was a reaction by the State to abandon a trial that was going poorly"). "The evidence pertinent to the first *Wheeler* factor supports the habeas court's ruling." *Ex parte Martinez*, 560 S.W.3d at 699.

2. **Did the State Repeatedly Fail to Disclose the Video Interviews After Admonitions from the Trial Court?**

11

Here, there is no evidence that before or during trial prosecutors—or any other former prosecutor or member of the DA's office—continued to withhold information after being repeatedly ordered to disclose it. *See Ex parte Wheeler*, 203 S.W.3d at 324. The evidence provides that once the trial court ordered the State to inquire into the contents of the alleged phone dump, the State immediately made a full disclosure to the trial court that it had just recently become aware of the two video interviews, and that the videos were apparently in its possession. Thus, there is no evidence demonstrating "the wil[l]fulness of repeated misconduct by the prosecutor," nor any evidence of "repeated misconduct." *Id.* at 328. The trial court did not order the State to disclose the information until after the jury was sworn in and the State began presenting its case. *See Ex parte Martinez*, 560 S.W.3d at 701. The State immediately complied, as instructed, when it was told to look into the contents of the phone dump. *See id.*

When we view the evidence relating to the disclosure of the video interviews in the light most favorable to the habeas court's ruling, "we hold there is no evidence that [the State]—or any other prosecutor or member of the [DA]'s Office—continued to withhold information after being ordered to disclose it." *Id.* at 700; *see Ex parte Wheeler*, 203 S.W.3d at 324. Accordingly, "this factor does not suggest an attempt to goad the defense into a mistrial or an attempt to avoid an acquittal." *Id.* at 701; *see Ex parte Masonheimer*, 220 S.W.3d at 507–08; *see also Martinez*, 2020 WL 5757196, at *4.

**3.** **Did the State provide a "good faith" Explanation for its Lack of Disclosure?**

The undisputed evidence provides that when the State found out about the existence of potential discovery, it immediately obtained it, and then disclosed the same. *See Ex parte Wheeler*, 203 S.W.3d at 324. The State emphasized that it was uncertain how the DVDs came to be included in appellant's file because the State did not log them into evidence, the DVDs were not paired with appellant's prosecution guide, the existence of the DVDs was not apparent from the original prosecution guide, the existence of the DVDs was not apparent from Detective Hines's supplemental reports, and the State did not review the DVDs prior to trial. The State reiterated that it did not know such interviews occurred or that such recordings existed. The habeas court was entitled to find that the State had a good-faith desire to provide appellant with all evidence in the State's possession. *See Ex parte Martinez*, 560 S.W.3d at 701. We cannot say that it was an abuse of discretion for the habeas court to find that the State provided a good-faith explanation for its failure to disclose the discovery at an earlier point in time. *See Hill*, 499 S.W.3d at 865. Therefore, on the record before us, this factor does not suggest intentional conduct aimed at provoking appellant into requesting a mistrial to avoid an acquittal. *See Ex parte Martinez*, 560 S.W.3d at 701.

### 4.    Was the State's Failure to Disclose "Clearly Erroneous?"

Here, the State testified that no one in the DA's office knew the video statements were made or otherwise existed, or that they were in possession of the State. It was only *during* trial that the State learned it may have failed to provide appellant with the evidence when Detective Hines testified that law enforcement performed a cell phone dump. Only after the State investigated the matter of the cell phone dump did the State obtain

13

*additional* information about law enforcement previously interviewing Jones and Pena. Nevertheless, the State fully disclosed to appellant all information as soon as it became aware of its existence.

Regarding the video interview statements, Detective Hines testified that Jones "seemed pretty high" during his interview. Nonetheless, during the interview, Jones denied showing an alleged video of the murder to any person, and Jones voluntarily gave Detective Hines two phones for law enforcement to perform a phone dump. Detective Hines further elaborated that during Pena's interview, Pena denied ever seeing an alleged video of the murder. In the video statement, Pena admitted that he witnessed Jones's mom punch another individual and say, "You filmed it," in response to hearing about the video of the murder. Both Jones and Pena denied knowing appellant.

Although the State concedes that the discovery should have been turned over pursuant to Article 39.14 of the code of criminal procedure, *see* TEX. CODE CRIM. PROC. ANN. art. 39.14(i), the State claims that its conduct does not tend to negate any evidence of appellant's guilt for the underlying murder, and therefore, is not "clearly erroneous." According to the State, the trial record demonstrates that the State was "about to admit, circumstantial evidence that [appellant] sexually assaulted the elderly victim while beating her to death and stealing her credit card," and the statements "from Jones and Pena do not contradict this evidence, nor do those statements establish that [appellant] is guilty of something other than capital murder." *See Pena v. State*, 353 S.W.3d 797, 811–12 (Tex. Crim. App. 2011) (holding that *Brady* material includes material, exculpatory evidence, and impeachment evidence). In this regard, Detective Hines testified that he was

compelled to seek an arrest warrant for appellant because of his DNA evidence found in Boyd's mouth and under her fingernails, and appellant's ties to Boyd's credit card use.

The habeas court found that both video statements indicated that there may have been additional witnesses to the murder and that someone filmed the murder, and we agree that while the interviews with Pena and Jones may shed light on additional suspects, those interviews do not negate appellant as the prime suspect given that appellant's DNA was located on Boyd's body. *See Ex parte Martinez*, 560 S.W.3d at 702 (finding that disclosure of information "would not tend to negate Martinez's guilt or reduce his sentence under the facts as found by the habeas court in its discretion"). Thus, appellant has failed to demonstrate how the State's conduct was clearly erroneous. *See Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006) (holding that an applicant seeking habeas corpus relief must prove his claim by a preponderance of the evidence); *see also Ex parte Rotter*, No. 02-23-00003-CR, 2023 WL 3370725, at *5 (Tex. App.—Fort Worth May 11, 2023, no pet.) (mem. op., not designated for publication) (finding that the State's conduct was not "clearly erroneous" where the record reflects that the State turned over the body camera footage as soon as the State realized that such discovery had not been previously disclosed); *Ex parte Watson*, No. 01-19-00637-CR, 2020 WL 7517453, at *8–9 (Tex. App.—Houston [1st Dist.] Dec. 22, 2020, no pet.) (per curiam) (mem. op., not designated for publication) (affirming the denial of a pretrial application for writ of habeas corpus where, after jury had been empaneled but prior to opening statements, the State discovered that footage from an officer' dash camera had not been turned over to the defense, and "[a]s soon as the State learned of the video, it alerted [appellant's]

15

counsel, told him the State would burn him a copy of the footage the same day and bring it to him, and offered to let him watch the video while it was being copied"); *Ex parte Lopez*, No. 2-06-00232-CR, 2007 WL 1776061, at *3 (Tex. App.—Fort Worth June 21, 2007, pet. ref'd) (mem. op., not designated for publication) (holding that State's failure to disclose two videos until after trial had started, which led to a mistrial, was a "prosecutorial blunder that was the result of inadvertence, sloppiness, or even simple negligence, none of which are bars to retrial"); *Ex parte Duke*, No. 05-15-00047-CR, 2015 WL 1636724, at *2 (Tex. App.—Dallas Apr. 10, 2015, no pet.) (mem. op., not designated for publication) (holding that "[t]he record shows no prosecutorial misconduct intended to goad appellant into requesting a mistrial" where the record showed that game warden turned over to prosecutor on the morning of trial an audio CD of radio traffic exchanged during chase of appellant's boat).

### 5. Was there a Plausible Basis—Legally or Factually—for the State's failure to Disclose?

As discussed above, the State's reasoning for not disclosing the video statements was because the State was not aware of its existence. Nonetheless, we concluded that the habeas court did not err in finding that the video interviews with Jones and Pena did not tend to negate appellant's guilt given the evidence connecting appellant to the crime. In the interviews, neither Jones's nor Pena's statements provide an opportunity for the jury to find appellant guilty of a lesser-included offense, contradict Boyd's age, contradict appellant's presence at the crime scene, contradict DNA evidence discovered at the crime scene, or contradict appellant's possession and use of Boyd's credit cards. *See Ex parte*

*Martinez*, 560 S.W.3d at 703. Viewing the bases provided by the State for withholding the information in the light most favorable to the habeas court's denial of appellant's application, we cannot say the habeas court abused its discretion. *See Kniatt*, 206 S.W.3d at 664. Thus, this fifth *Wheeler* factor does not suggest prosecutors engaged in behavior to goad the defense into a mistrial or that it acted out of fear of an acquittal. *See Ex parte Masonheimer*, 220 S.W.3d at 507–08.

**6.** **Was the State's Failure to Disclose Consistent with Intentional Misconduct?**

As a whole, the prosecutors involved in this case all testified that they did not intentionally seek to provoke or goad appellant into moving for a mistrial. The evidence supports the habeas court's finding that there was no bad faith on behalf of the State.

Nevertheless, appellant invites us to impute the conduct of Detective Hines to the prosecution team. However, in *Ex parte Montoya*, the Fourth Court of Appeals, relying on several unpublished cases, declined to impute a detective's conduct to the prosecutorial team, and we "must decide the case in accordance with the precedent of the transferor court under principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with our precedent." *See* TEX. R. APP. P. 41.3; *Ex parte Montoya*, No. 04-22-00283-CR, 2023 WL 3856739, at *3 (Tex. App.—San Antonio June 7, 2023, no pet.) (mem. op., not designated for publication); *see also Ex parte Masonheimer*, 220 S.W.3d at 506 (analyzing the mens rea from the lead prosecutor from the first trial in addition to the new lead prosecutor as the "entire prosecutorial team" to determine whether intentional prosecutorial conduct occurred to provoke a mistrial). This Court—

17

consistent with the Fourth Court of Appeals—has rejected the argument that law enforcement conduct amounted to prosecutorial misconduct because there was no evidence the law enforcement officer worked for the DA's office. *See Henderson v. State*, No. 13-16-00242-CR, 2019 WL 1561996, at *4 (Tex. App.—Corpus Christi–Edinburg Apr. 11, 2019, no pet.) (mem. op., not designated for publication). Therefore, like in *Ex parte Montoya* and *Henderson*, we conclude that Detective Hines's conduct is not imputed to the prosecutors. *See Ex parte Montoya*, 2023 WL 3856739, at *3 ("Montoya's argument requires us to impute the conduct of the detective to the prosecutor, but there is no evidence indicating Detective McNeely was part of the prosecutor's team or assigned or worked under the [DA]'s direction."); *Henderson*, 2019 WL 1561996, at *4 (rejecting the argument that law enforcement conduct amounted to prosecutorial misconduct because there was no evidence the law enforcement officer worked for the DA's office); *State v. Rushing*, No. 09-16-00423-CR, 2017 WL 4182316, at *7 (Tex. App.—Beaumont Sept. 20, 2017, pet. ref'd) (mem. op., not designated for publication) (holding that the conduct of employees in the sheriff's office could not be attributed to the State because there was no evidence they were employed by the DA). Even if the habeas court attributed Detective Hines's conduct to the State, there is no evidence indicating that Detective Hines intended to provoke appellant into requesting a mistrial. *See Ex parte Montoya*, 2023 WL 3856739, at *3. Again, when viewing the record in the light most favorable to the trial court's ruling, we cannot conclude that any alleged oversight by Detective Hines showed intent to subvert the protections afforded by the double jeopardy clause and goad appellant to moving for a mistrial. *See id.*

18

Given the evidence of the actions taken by the State in this case and the testimony relating thereto, the trial court was within its discretion in finding the State's actions were inconsistent with intentional misconduct. *See Kniatt*, 206 S.W.3d at 664. After analyzing the final *Wheeler* factor, we hold the evidence does not suggest the actions or inactions of the State were undertaken out of fear of an acquittal or for the purpose of goading appellant into moving for a mistrial. *See Ex parte Masonheimer*, 220 S.W.3d at 507–08.

## C.    Summary

"Here, the mistrial cured the due process violation stemming from the State's violation of its continuing duty of disclosure under article 39.14, Code of Criminal Procedure and *Brady*." *Ex parte Stewart*, No. 04-17-00249-CR, 2018 WL 1610920, at *4 (Tex. App.—San Antonio Apr. 4, 2018, no pet.); *Ex parte Coleman*, 350 S.W.3d at 160 ("The impropriety of the prosecutor's response was remedied by the mistrial."). The habeas court, after hearing testimony and reviewing evidence, found appellant failed to meet his burden to prove that the actions of the State were taken: (1) with the intent to goad or force him into requesting a mistrial in order to subvert double jeopardy protections; or (2) to avoid an acquittal. *See Ex parte Masonheimer*, 220 S.W.3d at 507–08; *Ex parte Coleman*, 350 S.W.3d at 160. Based on an examination of the evidence under the appropriate standard of review and considering the *Wheeler* factors, we hold the habeas court acted within its discretion in concluding appellant failed to establish by a preponderance of the evidence that the State intended to goad him into moving for a mistrial to subvert double jeopardy protections or to avoid an acquittal. *See Ex parte Masonheimer*, 220 S.W.3d at 507–08; *Ex parte Coleman*, 350 S.W.3d at 160. We

therefore hold the habeas court did not abuse its discretion in denying appellant's petition for writ of habeas corpus. We overrule appellant's sole issue.

## IV. CONCLUSION

We affirm the judgment of the trial court.

JAIME TIJERINA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
30th day of November, 2023.