

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-24-00710-CV

**IN THE MATTER OF T.H.**, a Juvenile

From the 436th District Court, Bexar County, Texas
Trial Court No. 2023JUV00773
Honorable Velia J. Meza, Judge Presiding

Opinion by:    Rebeca C. Martinez, Chief Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Adrian A. Spears II, Justice
H. Todd McCray, Justice

Delivered and Filed: July 16, 2025

AFFIRMED

T.H., a juvenile, appeals from the trial court's denial of his application for writ of habeas corpus following a mistrial.  He contends the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution bars retrial because (1) the prosecutor goaded him into requesting a mistrial and (2) the prosecutor intentionally violated the trial court's order in limine with the intent to avoid the possibility of an acquittal.  We affirm.

### BACKGROUND

The State filed a petition alleging T.H. had engaged in delinquent conduct by committing arson of a building.  *See* TEX. PENAL CODE ANN. § 28.02.  Prior to trial, T.H. filed a motion in limine, seeking to limit the introduction of certain evidence until the trial court had ruled, outside

the presence of the jury, that such evidence was admissible. Relevant to this appeal, the trial court

granted T.H.'s motion in limine to exclude: "Reference to any statement made by [T.H.]'s mother

. . . when offered to suggest dishonesty or untruthfulness." T.H.'s counsel explained at a pretrial

hearing:

> My concern is, the investigator in this case went to [T.H.]'s house. He has got a body camera recording of it where he spoke with [T.H.]'s mother, and their impression is that [Mother[1]] was less than honest with them about the whereabouts of [T.H.]. That's [Mother]'s lies. That's her dishonesty, if indeed it is, and it should not be in any way put on our child, [T.H.]. Those are statements made by [Mother] and her alone, and in any way trying to impu[gn] [T.H.] with the fact that his mother lied would be highly prejudicial and irrelevant.

The following discussion then ensued:

> [PROSECUTOR]: That would be under the hearsay rules, and I would argue I would only bring it up if there was an exception to hearsay. Because she's saying, Don't mention any out of court statements by witnesses, which is hearsay, so I will adhere to the Texas Rules of Hearsay.

> [T.H.'S ATTORNEY]: Judge, even if they came up with some exception to it, there still is the problem of using someone else's honesty or lack thereof to impu[gn] — the child is on trial, not them.

> THE COURT: So I will grant that motion. Actually, she's not to speak on anything about lies or anything. We're not going to go into anything about her statements, her lies.

> [PROSECUTOR]: But I can ask them whether they believed her?

> THE COURT: That's fine.

> [T.H.'S ATTORNEY]: Well, Judge, why are — her statements shouldn't come in at all. Like she just said, they're hearsay.

> THE COURT: They're hearsay but there's an exception. But on the face, they shouldn't come in at all.

---

[1] To protect the identities of minor children involved in this appeal, we refer to the children by their initials and T.H.'s mother as "Mother." *See* TEX. R. APP. P. 9.8(c)(2).

The next day, trial began. Over two days, the jury heard from six witnesses. The State's first witness was Taylor Erb, a San Antonio police officer. Erb testified that he responded to two dumpster fires on the night of June 22, 2023, at the Barcelo apartment complex. Shortly after arriving, he saw smoke rising from a neighboring apartment complex, the Melia apartments. Erb rushed to the Melia apartments and woke up residents in an apartment building connected to a burning maintenance building. On cross-examination, Erb affirmed that it had come to his attention "that there was a male and a female adult last seen near the dumpster maybe throwing trash in," and that these adults did not seem to live in the apartment complexes. Additionally, Erb acknowledged that there was a homeless encampment near the complexes.

Aliyah Smith, a resident of the Melia apartments, testified that she had installed a video camera above the back patio of her second-floor apartment. This camera overlooked the maintenance building. Smith explained that the camera was motion activated, and that it recorded video clips of about a quarter to a half minute in length. Smith, however, could not fully explain why the camera recorded only sometimes and specifically why it recorded only five videos of various lengths on the night of June 22–23, 2025. The trial court admitted these five videos into evidence.

The first video, with a time stamp of June 22, 2023, at 11:42:46–11:43:00 p.m., shows a juvenile with red and black hair. This was T.H.'s hairstyle at the time of the fires, and T.H.'s attorney did not contest that the video depicted T.H. The video shows T.H. walking toward the maintenance building with nothing in his hands, and then he opens the door, which appears unlocked. A light is on inside, and T.H. enters.

The second video, with a time stamp of June 22, 2023, at 11:56:35–11:57:13 p.m., shows the maintenance building engulfed in smoke. Firefighters are in the foreground. The video pans and shows a man on the patio directly below the camera.

The third video, with a time stamp of June 23, 2023, at 3:51:33–3:52:04 a.m., shows three individuals with flashlights directed at the maintenance building. The building is charred, and the individuals walk its perimeter. A fourth individual holding a firehose walks back to a firetruck.

The fourth video, with a time stamp of June 23, 2023, at 4:19:30–4:19:53 a.m., shows T.H. walking toward the charred maintenance building. He holds a cellphone in his hand.

The last video, with a time stamp of June 23, 2023, at 4:21:32–4:21:46 a.m., shows T.H. walking away from the maintenance building.

Smith further testified that she was outside on her patio for about two or three minutes before the camera began recording the second video, which depicts the maintenance building engulfed in smoke. She also testified that she had seen T.H. around the apartment complex before the fire and that T.H. removed the red dye from his hair a day after the fire.

Jamey Hatfield was the manager of the Melia apartment complex at the time of the fire. She testified that T.H. and his mother lived at the Melia apartments at that time. Hatfield testified that the dumpsters that caught fire at the Barcelo apartment complex were within "a couple hundred feet" of the maintenance building that caught fire at the Melia apartments. According to Hatfield, that distance could be covered in about a minute to a minute-and-a-half by walking.

D.P., who was twelve years old at the time of trial in August 2024, testified that he lived in the Melia apartment complex before moving. He knew T.H. from school and from the apartments. According to D.P., when he and T.H. were "near the ditch going to" the Barcelo apartments, T.H. said, "You know the apartments over there, well, I burned them down." On

cross-examination, D.P. testified that he moved into the Melia apartments around February 2024, and lived there for "[a]bout a year," "plus or minus a couple of months."

San Antonio Fire Department Investigator Glenn Frost was dispatched to the Melia apartments on the night of June 22–23, 2023, and he investigated the fire at the maintenance building. Frost interviewed the officer who led the fire-suppression team. That officer told Frost that his crew had trouble opening the door and had to force entry into the burning building. Frost testified that he determined the maintenance-building fire was intentionally set with "an open flame source" against an inside, back wall. According to Frost, signs of human involvement were (1) that the dumpster fires were in close proximity to the maintenance-building fire, (2) that a video depicted T.H. entering the maintenance building shortly before the fire was detected, and (3) that firefighters struggled to enter the building. As to this last sign, Frost testified, "Sometimes arsonists will put things behind the doors, and that can be an indicator." Additionally, Frost testified that T.H.'s return to the building after the fire was significant because, "[I]t's discussed in many articles how people who commit crimes tend to return to the scene of the crime." Frost ruled out chemicals, batteries, the weather, smoking materials such as cigarettes, and an electrical cause for the fire. Additionally, Frost found a lighter outside of the building, but he did not think it could have been an ignition source because the lighter "appeared to be old [and] weathered." He also did not think a Budweiser beer can found inside the building could have played a role in the fire because Frost's assistant could not smell any accelerants inside the can.

On cross-examination, Frost acknowledged that he did not investigate the dumpster fires because fire investigators "only respond to working structure fires." He also acknowledged that he did not know that Budweiser beer cans were found in the dumpsters that caught on fire earlier in the night. Additionally, Frost testified that he did not perform "arc mapping" or a "depth

calcination" test.[2]  Frost also did not test a broken fluorescent light found in the maintenance building.  According to Frost, a fluorescent light, if not properly set in a ballast, can heat up and cause a fire; however, Frost did not think that the fluorescent light found in the maintenance building caused the fire because he would have expected more damage to the ballast if it had.  Frost also testified that Hatfield told him, "[T]hey had been having problems with the homeless setting fires to cars and buildings."

The State's last witness was San Antonio Fire Department Arson Investigator Jesse Moncada.  According to Moncada, arson investigators are peace officers who become involved when there is a question of arson or other criminal offense.  Moncada stated his conclusion that the fire was an "incendiary, intentionally set fire[,] . . . [w]here a person with an open flame introduced heat to an ordinary combustible such as paper, cardboard or anything light."  Moncada based his conclusion on the video footage, the multiple fires that night, and the approximately ten minute timeframe between when T.H. walked into the maintenance building, as depicted on the video, until police noticed smoke.  Moncada then explained that his investigation involved identifying and locating the person shown in Smith's video who walked into the building before it caught fire.  Moncada proceeded with his investigation by asking Smith and Hatfield whether they recognized the individual.  From these inquiries, Moncada was able to locate T.H.  On June 23, 2023, during the day, Moncada saw T.H. and his mother at their apartment.  Moncada identified these individuals from a picture.

Next, the prosecutor asked: "Did you inquire about an alibi?"  Moncada answered: "Yes." T.H.'s attorney objected and asked for a bench conference.  The trial transcript shows:

---

[2] Frost testified briefly that arc mapping could help determine whether electricity caused the fire.  The nature of a depth calcination test was not described at trial.

[T.H.'S ATTORNEY]: — they have created a bias when they have just violated that (inaudible). They just asked if he was familiar and if he spoke to (inaudible) and they have just gotten into it by talking if he asked them about an alibi.

[PROSECUTOR]: I never —

[T.H.'S ATTORNEY]: I move for a mistrial, Your Honor.

The discussion continued outside the presence of the jury:

[T.H.'S ATTORNEY]: [M]uch of the conversation was directed at the mother and since you ruled that that was not to come in at all.

[PROSECUTOR]: Statements. I'm not going into any statements.

[T.H.'S ATTORNEY]: The lack of statements also —

[PROSECUTOR]: He said I could do an opinion, what he believed.

[T.H.'S ATTORNEY]: Judge, I do not recall the Court making that ruling at all.

[PROSECUTOR]: I verified because I planned on going into it. I said "I will not go into any statements but I can ask him if he believed him or not?" That's exactly what I was going to ask.

[T.H.'S ATTORNEY]: First of all, by going into any conversation at all, it let[s] the jury know that he took his right to silence and he took his right to an attorney. Duo v. Ohio said the State cannot comment on those two things. We can't even unring the bell on what they have just done.

On top of that, the conversations are occurring when his mother's there. It's lack of confrontation, it's hearsay, and whether this officer believes or disbelieves is irrelevant. His opinion on the honesty of the mother is not before this jury. It's not an element.

[PROSECUTOR]: It's absolutely whether he could rule out that this respondent was there at the time of the incident because that was one of the issues. She said he couldn't be there because he was somewhere else. So he didn't believe that because he had the video so that went into his criminal investigation, like, okay, when people are lying, it means there's something there. So that was part of his investigation and that was part of the conclusion that it was human involved and that this is the respondent who did it. It's absolutely relevant. It goes to —

[T.H.'S ATTORNEY]: It's the mother's statement, what she's saying. She's trying to disprove what the mother said. He doesn't believe her and, because of that, they want to use it to hold against the child.

A second prosecutor then argued that a hearsay exception applied because Moncada was an expert and that the question went to Moncada's determination that the fire involved a criminal element. The prosecutor who asked the question of Moncada next argued that the question went to Moncada's determination that there was a human cause for the fire. After hearing the arguments, the trial court took the matter under advisement and, after a short recess, declared a mistrial.

The case was reset for a second trial for October 2024, and it was set before a different judge.[3] Before the second trial began, T.H. filed an application for writ of habeas corpus, seeking to bar retrial under the Double Jeopardy Clause of the United States Constitution. *See* U.S. CONST. amend. V.[4] The trial court held a hearing on the matter, during which the prosecutor presented further justifications for asking her question that preceded the mistrial. In her explanations, the prosecutor parsed the trial court's ruling on the motion in limine. She explained that she perceived a distinction between testimony about Mother's statements and testimony about Moncada's belief regarding those statements. According to the prosecutor:

> I was not going to go into any statements whatsoever. My reading of the Court, and my understanding at the time, the motions in limine, was that he gave me permission to do that. I understand it can be considered backdoor hearsay. I understand that, but my intention is — he said[,] "That's fine." He didn't say I could not ask an opinion. He said I could not go into the hearsay or the lies on their face, which to me meant the statements. The actual statements that she said, unless I had an exception.

The prosecutor acknowledged: "I was tiptoeing around statements themselves, and I do admit that, but that's because I thought I had permission from the Court." The prosecutor also stated: "[W]e

---

[3] The Honorable William Shaw presided over the first trial, and the Honorable Velia J. Meza presided over the habeas proceedings that preceded the scheduled second trial.

[4] T.H. also argued for a bar to retrial based on the Double Jeopardy Clause in the Article I, section 14 of the Texas Constitution, but he has not carried this claim forward on appeal. *See* TEX. CONST. art. I, § 14.

were crushed when this was called for a mistrial. We were done. We thought we had a good case[.]"

T.H.'s attorney responded that the prosecutor's question went to Mother's statements, which the order in limine excluded:

> The question that was asked, that was objected to was not a question about an opinion on truthfulness. It was a question about an alibi, which the State knew well was a lie. It was false. So the question was clearly asked about the lies about the statements.

The prosecutor responded:

> The reason for asking that question was because . . . [t]hey said they never — they never disputed that this respondent was in that video, which is true, but Mom had said he wasn't there that night. And then Defense spent the entire trial and through the Daubert hearing trying to discredit that video. So, of course, we had to defend that video and show that there was — that the video was accurate and that he did not — he was not anywhere else that night. So, yes. There was a purpose for it. It went to the elements. It went to the identity of the respondent as the person who committed this crime[.]

The prosecutor concluded: "And [T.H.'s attorney] said it right. Why do it? There was no reason to do it, which goes to my intent. There was no objective reason for me to cause a mistrial."

The trial court took the matter under advisement and issued an order denying the habeas application the next day. In the order, the trial court gave findings of fact and conclusions of law, including a finding of misconduct on the part of the prosecutor in failing to approach the bench before asking Moncada her question about an alibi. Nevertheless, the trial court's order provides:

> However, this court also finds that the prosecutor believed that she had a legally sound basis for her question. The prosecutor clearly disagreed with the accusation against her that she was asking a question that could lead to back door hearsay. She did agree that she was "tiptoeing" around the issues that were the subject of the motion in limine, but she believed that she could ask that question without it being a violation.

The trial court concluded: "It is clear to this court that the governmental conduct in question was not intended to goad or provoke [T.H.] into moving for a mistrial."

T.H. appealed from the trial court's order, and we stayed trial proceedings pending disposition of this appeal. On appeal, T.H. argues that the prosecutor goaded him into requesting a mistrial and that the prosecutor intentionally violated the trial court's limine order with the intent to avoid the possibility of an acquittal.

### STANDARD OF REVIEW & APPLICABLE LAW

This appeal arises from a delinquency proceeding that, while nominally civil, is a "quasi-criminal" matter. *In re C.O.S.*, 988 S.W.2d 760, 765 (Tex. 1999). The parties cite to authorities from adult criminal proceedings in Texas, presumably, because T.H.'s double jeopardy claim has no parallel in civil law. Under similar circumstances, where there was no civil equivalency, we "employ[ed] the scope and standard of review used in criminal cases to review a juvenile court's ruling." *Matter of S.J.*, 977 S.W.2d 147, 151 (Tex. App.—San Antonio 1998, no pet.) (discussing suppression ruling); *see also Matter of H.S.M.*, No. 04-21-00262-CV, 2024 WL 2732319, at *7 & 7 n.6 (Tex. App.—San Antonio May 29, 2024, pet. denied) (reviewing adult criminal cases as "helpful authority" to resolve issue about corroboration of accomplice witness testimony). Likewise, following the parties' lead and our past practice, here we apply the standards and applicable law from adult criminal proceedings in Texas to resolve this dispute.[5]

Under criminal-law standards, an applicant seeking pretrial habeas relief must prove his claim by a preponderance of the evidence. *See Ex parte Martinez*, 560 S.W.3d 681, 695 (Tex. App.—San Antonio 2018, pet. ref'd). On appeal, we review a trial court's ruling to grant or deny habeas relief for an abuse of discretion, and we must review the evidence in the light most

---

[5] T.H. and the State argue from these precedents, which include *Ex parte Masonheimer*, 220 S.W.3d 494, 496 (Tex. Crim. App. 2007). Additionally, the State contends in its brief: "The State submits that *Masonheimer* was wrongly decided and that the Texas Supreme Court should disagree with the Court of Criminal Appeals." It also asserts: "This is an argument for a change in precedent that this Court likely cannot entertain. But the State wants to ensure that this argument is preserved for a later petition or cross-petition for discretionary review." Because the State has not directly addressed its issue with us and this matter is not dispositive, we apply *Masonheimer* as if it were binding.

favorable to the trial court's ruling. *Id.* "[W]e must afford great deference to the habeas court's findings and conclusions, especially when . . . they involve determinations of credibility and demeanor." *Id.* "The mere fact that we might decide the matter differently is insufficient to constitute an abuse of discretion; rather, to overturn the habeas court's ruling on a petition for writ of habeas corpus, we must find the ruling was outside the zone of reasonable disagreement." *Id.*

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution generally prohibits the State from placing a criminal defendant in jeopardy twice for the same offense. *Pierson v. State*, 426 S.W.3d 763, 769 (Tex. Crim. App. 2014); *Martinez*, 560 S.W.3d at 695; *see* U.S. CONST. amends. V, XIV. "[T]he Double Jeopardy Clause affords a criminal defendant a valued right to have his trial completed by a particular tribunal." *Oregon v. Kennedy*, 456 U.S. 667, 671–72 (1982) (citation omitted). However, double-jeopardy protections do not preclude the retrial of a criminal defendant if the defendant requested a mistrial, unless a "narrow exception" applies. *See Kennedy*, 456 U.S. at 673; *Martinez*, 560 S.W.3d at 695. As the Supreme Court stated in *Kennedy*:

> Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.

*Kennedy*, 456 U.S. at 676; *see also Ex parte Lewis*, 219 S.W.3d 335, 368 (Tex. Crim. App. 2007) (adopting *Kennedy* standard).

The Texas Court of Criminal Appeals took the protection further in *Ex parte Masonheimer*, 220 S.W.3d 494 (Tex. Crim. App. 2007). There, the court examined cases cited with approval in *Kennedy* to determine that an additional set of "unique circumstances" could bar retrial. *See id.* at 506–09. In *Masonheimer*, a defendant filed a habeas application seeking to bar a third retrial after

- 11 -

two previous trials ended with mistrials upon the defendant's requests. *Id.* at 495. The trial court

granted habeas relief, and Court of Criminal Appeals affirmed, writing:

> Viewed in the light most favorable to the trial court's ruling, the evidence supports a finding that appellee's mistrial motions, which resulted in the termination of the first two proceedings prior to verdict, were provoked primarily by the State's intentional failure to disclose exculpatory evidence with the specific intent to avoid an acquittal at the first proceeding. Appellee did not discover all of the undisclosed exculpatory evidence until the second proceeding. We hold that, under the unique facts of this case, a third prosecution is jeopardy-barred under the state and federal constitutions.

*Id.* at 495 (footnote omitted).

> Thus, under the *Kennedy* and *Masonheimer* holdings,

> when a defendant moves for a mistrial and subsequently claims retrial is barred by double jeopardy, the habeas court, and all subsequent reviewing courts, must determine whether: (1) the prosecutor engaged in conduct to goad or provoke the defense into requesting a mistrial; or (2) the prosecutor deliberately engaged in the conduct at issue with the intent to avoid an acquittal.

*Martinez*, 560 S.W.3d at 697 (citing *Masonheimer*, 220 S.W.3d at 507–08; *Lewis*, 219 S.W.3d at

336; *Ex parte Coleman*, 350 S.W.3d 155, 160 (Tex. App.—San Antonio 2011, no pet.)).

To aid trial and appellate courts in determining whether the prosecutor had the requisite

intent, the Court of Criminal Appeals in *Ex parte Wheeler*, 203 S.W.3d 317, 324 (Tex. Crim. App.

2006), set out several non-exclusive factors:

> (1) Did it reasonably appear, at the time the prosecutor acted, that the defendant would likely obtain an acquittal?; (2) Was the alleged misconduct repeated after admonitions from the trial court?; (3) Did the prosecutor provide a "good faith" explanation for his conduct?; (4) Was the conduct "clearly erroneous"?; (5) Was there a plausible basis — factually or legally — for the conduct, despite any ultimate impropriety?; and (6) Were the prosecutor's actions leading up to the mistrial consistent with inadvertence, negligence, or lack of judgment, or were they consistent with intentional misconduct?

*Martinez*, 560 S.W.3d at 697 (modifying the sixth factor in light of the Court of Criminal Appeal's overruling of *Ex parte Bauder*, 974 S.W.2d 729 (Tex. Crim. App. 1998), *overruled by Lewis*, 219 S.W.3d at 371); *see also Wheeler*, 203 S.W.3d at 323–24.

## DISCUSSION

T.H. argues that the denial of habeas relief should be reversed because the trial court failed to properly apply *Masonheimer*. In its order denying relief, the trial court distinguished *Masonheimer* on the basis that *Masonheimer* involved the withholding of exculpatory evidence, while T.H.'s habeas complaint involved the admission of *inculpatory* evidence. T.H. asserts in his appellate brief — and the State concurs — that under current law, *Masonheimer* can be applied in "non-*Brady* cases."[6]

We agree with the parties that *Masonheimer* can be applied to non-*Brady* cases insofar as we have previously considered *Masonheimer* in a non-*Brady* case. *See Coleman*, 350 S.W.3d at 159 (affirming denial of habeas relief where defendant argued double-jeopardy protections barred retrial after defendant moved for a mistrial based on prosecutor's improper sidebar remark). Nevertheless, we do not reverse because the trial court rendered the proper judgment to deny habeas relief based on its findings. *See Valencia v. Garza*, 765 S.W.2d 893, 898 (Tex. App.—San Antonio 1989, no writ) ("If the controlling finding of facts will support a correct legal theory, incorrect legal conclusions will not require a reversal."); *cf. State v. Sheppard*, 271 S.W.3d 281, 292 (Tex. Crim. App. 2008) (explaining reviewing court focuses on the validity of the application of the law to the specific facts the trial court actually found).

---

[6] The parties reference *Brady v. Maryland*, 373 U.S. 83 (1963), which requires the State to disclose "evidence materially favorable to the accused." *Youngblood v. W. Virginia*, 547 U.S. 867, 869 (2006) (citing *Brady*, 373 U.S. at 87). The Court of Criminal Appeals assumed that the undisclosed evidence at issue in *Masonheimer* met the *Brady* standard. *See Masonheimer*, 220 S.W.3d at 495 n.1.

Whether reviewed as an intent to "goad" T.H. into moving for a mistrial, *see Kennedy*, 456 U.S. at 676, or an intent to "avoid the possibility of an acquittal," *see Masonheimer*, 220 S.W.3d at 507, the ultimate question is whether the prosecutor acted with an intent to subvert T.H.'s right to have his guilt or innocence determined before the first trier of fact. *See Kennedy*, 456 U.S. at 675–76. As the Supreme Court stated:

> Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. A defendant's motion for a mistrial constitutes a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact.

*Id.* at 675–76 (citation omitted). To determine intent, we look to the *Wheeler* factors, which we have applied both when considering whether a prosecutor held an intent to goad a defendant into moving for a mistrial and whether a prosecutor held an intent to avoid the possibility of an acquittal. *See Martinez*, 560 S.W.3d at 697–705; *Coleman*, 350 S.W.3d at 159–161.

Here, the trial court considered the *Wheeler* factors and found that the prosecutor believed she had a legally sound basis for her question and that the prosecutor's question was not intended to goad or provoke T.H. into moving for a mistrial. The trial court's findings support its ultimate conclusion that the prosecutor did not act with an intent to subvert T.H.'s protections afforded by the Double Jeopardy Clause. *See Kennedy*, 456 U.S. at 675–76. We affirm denial because the evidence supports this ultimate conclusion under the *Wheeler* factors. *See Martinez*, 560 S.W.3d at 697 ("In determining whether the habeas court abused its discretion in denying Martinez's application, we consider the evidence in the light most favorable to the court denial using the *Wheeler* factors.").

As to the first *Wheeler* factor, viewing the evidence in the light most favorable to the ruling, the record does not show that trial was "going badly for the State" or that T.H. would likely have

obtained an acquittal if not for the improper question and subsequent mistrial. *See Wheeler*, 203 S.W.3d at 324. The matter before the jury was whether T.H. engaged in delinquent conduct by committing arson of a building. *See* TEX. PENAL CODE ANN. § 28.02(a)(2). A person commits arson of a building if the person starts a fire with the intent to destroy or damage a building. *Id.* Viewed favorably to the habeas ruling, the evidence shows that T.H. entered the maintenance building approximately eleven minutes before Smith saw it burning. Video captured T.H.'s entrance and then the building engulfed in smoke fourteen minutes later. T.H. returned to the scene alone several hours later. Smith testified that T.H. changed his distinctive hairstyle the next day, and D.P. testified that T.H. informed him, "You know the apartments over there, well, I burned them down." Investigator Frost and Arson Investigator Moncada explained their investigations to the jury and the reasons for their conclusions that the fire was intentionally set.

True enough, T.H., through his attorney, elicited testimony that the apartment management had concerns about a nearby homeless community and that two homeless adults were last seen near the dumpsters before they caught fire. On cross-examination, T.H.'s attorney elicited from Investigator Frost that he did not investigate the dumpster fires or perform all possible tests that could rule out a non-human cause for the maintenance-building fire or that could suggest an alternative ignition source or starting location. Additionally, D.P.'s testimony was inconsistent in that D.P. claimed to have lived at the Melia apartments for approximately a year, but also stated that he moved into the apartments in February 2024, and had moved out by the time of trial in August 2024 — a period of six months. Moreover, T.H. highlights in his brief the fourteen-minute gap between his entrance into the maintenance building, which was unlocked with a light on, and the subsequent video showing the fire "mid-blaze." T.H. also is correct that photos in evidence

show bystanders after the fire, indicating that T.H. was not alone in showing interest in the burned building.

However, viewed in the light most favorable to the trial court's decision, these gaps and inconsistencies do not show that T.H. likely would have obtained an acquittal. The gap in the video evidence was fourteen minutes between one video showing no indication of fire and the next showing the building engulfed in smoke. Conceivably, a person other than T.H. or a cause other than human could have been responsible for the fire starting within this fourteen-minute gap, and this cause conceivably could have avoided detection by the motion-activated video camera. This person or cause also could have avoided detection by the fire and arson investigators based on the investigators' failure to conduct all possible tests. While conceivable, we cannot say acquittal was likely.

Second, the prosecutor's misconduct was not repeated after admonitions from the trial court. *See Wheeler*, 203 S.W.3d at 324. The prosecutor did not violate the order in limine other than through the question that preceded the mistrial. "[A] single violation of a motion in limine is insufficient to show repeated, wil[l]ful violations made despite judicial admonitions." *Id.* at 328.

As to *Wheeler* factor four, the State does not challenge T.H.'s assertion that the conduct was "clearly erroneous," *see id.* at 324, or the trial court's finding that the prosecutor erred by failing to approach the bench before asking her question of Moncada. *Wheeler* factors three and five concern whether the prosecutor provided a reasonable, "good faith" explanation for the conduct and whether there was a legally or factually plausible basis for the conduct, despite its ultimate impropriety. *Id.* The parties argue these factors together. T.H. argues the prosecutor's explanations shifted and that she never offered a sound explanation. The State responds that the

prosecutor honestly, but mistakenly, believed her question to Moncada did not run afoul of the order in limine.

> We must "defer to the trial judge's factfinding." *Id.* at 330. Here, the habeas judge found:

> [T]he prosecutor believed that she had a legally sound basis for her question. The prosecutor clearly disagreed with the accusation against her that she was asking a question that could lead to back door hearsay. She did agree that she was "tiptoeing" around the issues that were the subject of the motion in limine, but she believed that she could ask that question without it being a violation.

The record supports these findings. To begin, the trial court's instructions at the pretrial hearing could be understood to make a distinction between Mother's statements and testimony about any belief as to these statements. Even when the trial court clarified, "they shouldn't come in at all," the indefinite pronoun "they" could honestly be understood to refer only to Mother's statements, and not also testimony about belief as to those statements. Relatedly, the trial court's statement, "They're hearsay," could honestly be understood by the prosecutor to concern only the problem of hearsay as to Mother's statements and not backdoor hearsay related to testimony about belief as to those statements. We must defer to the habeas court's determination that the prosecutor believed she had a legally sound basis for her question where this record suggests an honest, but erroneous, belief was possible. *See Martinez*, 560 S.W.3d at 695.

As to the prosecutor's various explanations, the gist of her statements, which cover several pages of transcript from the bench conference at trial and the habeas hearing, is that the prosecutor intended to explore whether T.H. or his mother gave an alibi and Moncada's belief as to the alibi. The prosecutor intended to explore these matters to address T.H.'s theory that someone else could have started the maintenance-building fire and to explain Moncada's involvement, which only would have occurred if there had been a crime. While the prosecutor should have discussed these matters at a bench conference before inquiring into them, the prosecutor's explanations are

plausible considering T.H.'s defensive strategy to acknowledge that the videos depict him but deny he started the fire. His strategy logically raises a question as to his whereabouts during the fourteen-minute gap between videos, and the prosecutor may have wished to discredit any potential alibi to prove her case. While her actions went beyond the line established by the order in limine, if believed, her rationale was not one to subvert T.H.'s double-jeopardy protections. The trial court could have taken the prosecutor's concluding statement, "There was no reason to do it," as an admission of overreaching, and not as a concession of improper intent. *See Wheeler*, 203 S.W.3d at 329 ("Only those present in the courtroom at the time could determine whether this statement, ["Judge, I got to ask it sometime",] was made in a flippant or earnest manner[.]").

As to the final *Wheeler* factor, viewing the record in the light most favorable to the trial court's ruling, the prosecutor's actions leading up to the mistrial were consistent with inadvertence, lack of judgment or negligence and not intentional misconduct. *See id.* at 324. The habeas judge was well positioned to gauge the prosecutor's credibility and demeanor during the habeas hearing, during which the prosecutor asserted: "[W]e were crushed when this was called for a mistrial. We were done. We thought we had a good case[.]" *See id.* at 326 (remarking that habeas judge was positioned to gauge prosecutor's credibility and demeanor and could assess the cogency and genuineness of his explanation). "In context, the prosecutor appears more rash than Machiavellian." *Id.* at 328.

When viewing the record in the light most favorable to the trial court's ruling and deferring to its findings, we hold that T.H. failed to prove by a preponderance of the evidence that the prosecutor engaged in conduct to goad or provoke T.H. into requesting a mistrial or to avoid the possibility of an acquittal. *See Kennedy*, 456 U.S. at 676; *Wheeler*, 203 S.W.3d at 323–24; *Masonheimer*, 220 S.W.3d at 507–08; *Martinez*, 560 S.W.3d at 697.

**CONCLUSION**

We affirm the trial court's order denying pretrial habeas relief, and we lift our previously-ordered stay of all trial court proceedings.

Rebeca C. Martinez, Chief Justice